THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LOUIS R. SUMMERS, Defendant-Appellant.

Fourth District No. 4—89—0427

Opinion filed August 30, 1990.

2

4

Daniel D. Yuhas and Jane Raley, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

Defendant, Louis Summers, was convicted by a jury of first degree murder. His 19-month-old stepson, Ryan, was the victim. On appeal, defendant contends that (1) his conviction for first degree murder should be reduced to involuntary manslaughter, (2) the trial court improperly instructed the jury, (3) the trial court improperly admitted

evidence of "other crimes," and (4) he was denied the effective assistance of counsel.

We affirm.

I

On December 30, 1988, a caseworker with the Department of Children and Family Services (DCFS), Janice Turkington, visited defendant's home in order to take Cindy Summers, defendant's wife, to a laundromat. Ryan was asleep on the floor when Turkington arrived and nothing seemed out of the ordinary to her. However, Turkington could not see Ryan's face.

Turkington and Cindy left around 7:20 a.m. Later that day, around 7:40 a.m., deputy sheriff George Williams served defendant with summonses for the custody hearings regarding his five children from a previous marriage. Two of defendant's children from a previous marriage, ages 9 and 11, were already living in the house, as were three of Cindy's children, ages 4, 2, and 19 months. Deputy Williams remained within defendant's residence for approximately 10 minutes and noticed nothing unusual.

Thirty minutes later, Officer Lance Wiemelt responded to an emergency call from defendant's home. As Wiemelt exited his squad car, defendant ran out of his house screaming that his baby had stopped breathing. Defendant told Wiemelt that the baby suffered from asthma. Officer Wiemelt found Ryan lying on the living room floor. Ryan was breathing sporadically and one of his toenails had been torn off. Officer Wiemelt observed no bruises on the child.

Defendant described the origin of Ryan's toe injury and the asthma attack to several people. Each version of events differed from the others.

Defendant told Officer Wiemelt that Ryan got his foot caught in some bed springs and began crying. Defendant said he laid Ryan on the floor, and Ryan stopped crying. Then, when defendant entered the room after using the bathroom, Ryan's body was jerking and he was not breathing. Defendant picked Ryan up and ran outside for some air.

Defendant later told Turkington that he found Ryan crying and that his pupils were dilated. Defendant gave Ryan mouth-to-mouth resuscitation until he appeared to be breathing. A few minutes later, Ryan began crying again and defendant found Ryan's foot caught in the bed springs. Defendant instructed one of the older children living in the home to call for help.

At the hospital, defendant spoke with Officer Brenda Williams.

Defendant told Officer Williams that 15 minutes after removing Ryan's foot from the box spring, Ryan's body began to jerk. He was unresponsive and gasping for breath. Defendant ran outside with Ryan and told his sons to call an ambulance.

Defendant was also interviewed by Officer Kelvin Roberts. Detective Neal Baker was present during this interview. Defendant related three versions of events to Roberts. First, defendant told Roberts that he heard Ryan crying and took Ryan's foot out of the coil springs, but defendant was not sure what caused Ryan's toe injury. In the next version, defendant said that he discovered Ryan seated on the floor some distance away from the coil springs. In his third version, defendant told Roberts that he lifted Ryan off the coil springs and rolled him over on the coil springs so that Ryan could go back to sleep.

Roberts pointed out to defendant that his version of events had changed three times. In response, defendant appeared frustrated, backed up in his chair, lowered his head, and said, "I know. I know."

The next day, Detective Baker interviewed defendant at the police station. Defendant first told Baker that defendant heard Ryan crying, found him sitting on the floor beside the box spring, laid him down on the floor, and later found him gasping.

During the second part of the interview, Baker testified that defendant said he "might as well tell us that he did it because we were going to arrest him for it anyway." Defendant then leaned forward, began to cry, and stated to Baker "that he had done it." Defendant then explained that he picked Ryan up, laid him down next to his brother, told him in a forceful manner to shut up and go back to sleep, and struck him on the right side of his head. Defendant demonstrated to Baker how he hit Ryan by making a sweeping motion with his right hand. Defendant said that he took Ryan into the living room, instructed one of his older children to call an ambulance, shook Ryan, and washed Ryan's bleeding foot. Defendant claimed he hit Ryan only once on the right side of the head. Defendant also told Baker that he did not know how Ryan's toenail came off.

In this interview, defendant also told Baker that he did not love Ryan or Ryan's brother. Defendant admitted that he referred to them in vulgar terms. In addition, defendant admitted that he disciplined all of the children by smacking their hands and butts and by "tapping" their foreheads.

Jan Kelly, a child-welfare specialist, also spoke with defendant on December 31, 1988. She testified that defendant told her, "I never meant it. I didn't want this to happen."

A friend of the Summerses, Blaine Vaughn, testified that he and two female friends visited the Summerses' home on the evening of December 29, 1988. Vaughn stated that the children looked fine and he saw no one physically abuse them. However, when Vaughn and one of the female guests picked up Ryan and Ray, Ryan's two-year-old brother, to play with them, defendant called the children "little fuckers and dick heads." Later, Vaughn went into an adjacent room with defendant and, without others present, asked defendant not to call them those names.

Dr. Gregory Simmons, the pathologist who performed the autopsy on Ryan, testified that his examination of Ryan's body revealed three bruises on the forehead, three or four bruises on the face, four bruises on the left arm, two bruises on the back, one bruise on the inner right knee, one abrasion on the right temple, and one avulsed toenail. Three of the bruises were sectioned and examined microscopically, and Dr. Simmons concluded they were relatively recent, consistent with having occurred within 72 hours of death. There was no inner limit on when the bruises were caused. Each bruise was about one inch in diameter. The bruises that were not sectioned nonetheless appeared to Dr. Simmons to have the same color as the bruises which were sectioned. All of the bruises appeared to be of the same age.

The internal examination revealed that Ryan had been suffering from a mild pneumonia. Dr. Simmons discovered that the brain was massively swollen and a portion of it protruded into the opening through which the spinal cord must travel. This protrusion was significant enough to cut off the respiratory drive center at the base of the brain. In Dr. Simmons' opinion, Ryan's death was caused by brain swelling resulting from external trauma to the head. However, Dr. Simmons was unable to determine the nature of the trauma or the amount of force applied. He opined the marks on Ryan's head could have been caused by a fall, a run into a blunt object, or a human fist.

A pediatric neurosurgeon who examined Ryan on the morning of December 31, 1988, Dr. William Hanigan, diagnosed Ryan as having tin ear syndrome. This condition consists of three elements. Sometimes a fourth element is present. The first element is an injury or hemorrhage to the external ear. The second is marked cerebral swelling on the same side as the ear injury. The third is injury and hemorrhages in the retina, and the fourth is death within 36 to 48 hours of when the blow was struck. This syndrome is confined to children two to four years of age.

When Dr. Hanigan examined Ryan, he was in a coma, not breath-

ing on his own, and brain dead. Ryan had bruises on his left ear and a hemorrhage on the top of the ear. The left side of Ryan's brain was swollen in a manner consistent with having received a blow to the region of the left ear.

In Dr. Hanigan's opinion, the trauma to Ryan's head caused his death. He further opined that the trauma causing Ryan's death was a tangential or glancing blow of sufficient magnitude as to preclude any inadvertent blow. Dr. Hanigan testified that the amount of force inflicted on Ryan was approximately 70 foot-pounds. According to Dr. Hanigan, Ryan suffered from "a pretty hefty blow" and "a directed smash." Dr. Hanigan further explained that a boxer's punch is roughly 90 to 110 foot-pounds. When the prosecutor asked if there was any way Dr. Hanigan could more fully describe 70 foot-pounds to the jury, he said yes, and he did so by striking the table with what he termed a "smash, a directed smash."

Dr. Hanigan also testified that he had written an article for a medical journal on tin ear syndrome. He researched the amount of force necessary to cause the syndrome in consultation with a mechanical engineer and a biomedical engineer. He also spoke with trainers for professional boxers. By hooking up his hand to a variety of gauges and then striking a wall, Dr. Hanigan was able to judge various blows he struck in terms of foot-pounds. He further defined one foot-pound as essentially meaning the amount of force needed to lift one pound one foot. Dr. Hanigan further explained that these measurements were not exact, but rough estimates.

Cindy Summers, defendant's wife, testified as to how she and the defendant disciplined their children. Cindy said that she would tap their hands or hit their buttocks; defendant would hit their heads. She said defendant often criticized her about the way in which she disciplined the children and encouraged her to "slap them real hard." Defendant sometimes hit Ray, Ryan's two-year-old brother, "up the side of the head" when they were at the supper table. Defendant would claim he was disciplining the child. When Cindy would ask defendant about bruises and marks on the children, defendant would claim they were clumsy and fell down a lot.

Cindy also stated that defendant never showed affection toward Ryan. On the night of December 29, 1988, Cindy testified that defendant called Ryan and Ray "motherfuckers and cocksuckers." She said that defendant had many times before called them vulgar names. That night at dinner, Cindy said defendant stood behind the table, staring at her and the children. She said he watched every time she went to Ryan and Ray. She also said that if she would spend time with Ryan,

defendant would give her dirty looks.

Defendant had been hospitalized in December 1988, and was released on December 23, 1988. Cindy testified that defendant behaved differently after he left the hospital. He did not show affection toward Ryan and Ray.

On the night of December 29, 1988, Cindy noted that Ryan was in good physical condition. Between 2 and 3 a.m., Ryan woke up crying, and defendant said he would check on Ryan. Defendant was with Ryan for a short time and then returned to bed, telling Cindy that Ryan was okay. Cindy did not hear any further crying from Ryan. Before Cindy went to do the laundry with Turkington on the morning of December 30, 1988, she testified that she "looked in on" Ryan and Ray, who were both sleeping in the next room. They appeared normal.

Later that same day at the hospital, Cindy testified defendant told her that Ryan had an asthma attack. A year earlier, Ryan had been in an oxygen tent in a hospital, but Cindy recalled the problem as being a condition more like bronchitis. Later, when they were at home, defendant told her Ryan had gotten his toe caught in the box springs.

Defendant did not testify, and the defense rested without presenting any evidence.

The jury returned a verdict of guilty of first degree murder.

II

Defendant first argues that his conviction for first degree murder should be reduced to involuntary manslaughter because the evidence failed to prove beyond a reasonable doubt that defendant struck Ryan knowing that his acts created a strong probability of death or great bodily harm. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2).) In support of his claim, defendant alleges that the single blow to Ryan's head, as distinguished from a continuous beating, supports a finding of recklessness.

■■ ■ A criminal conviction will not be set aside unless the evidence presented at trial is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276.) The evidence must be viewed in the light most favorable to the prosecution, and if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the conviction must be affirmed. (*Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.) The resolution of factual disputes and the assessment of the credibility of witnesses are functions of the jury. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

■■ ■ The State must prove beyond a reasonable doubt that a defendant charged with first degree murder, as defined in section 9— 1(a)(2) of the Criminal Code of 1961 (Code), knew that the acts he performed which caused the victim's death are such as to create a strong probability of death or great bodily harm. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2).) Mental states, such as the intent to kill or to cause great bodily harm, are not commonly proved by direct evidence. (See *People v. Terrell* (1989), 132 Ill. 2d 178, 204, 547 N.E.2d 145, 155.) Instead, they may be inferred from the character of a defendant's acts and the circumstances surrounding the commission of the offense. (*Terrell*, 132 Ill. 2d at 204, 547 N.E.2d at 155-56.) A defendant is presumed to intend the natural and probable consequences of his acts, and evidence that he committed a voluntary and wilful act which has the natural tendency to cause death or great bodily harm is sufficient to prove the intent required for the offense of murder. *People v. Foster* (1987), 119 Ill. 2d 69, 88, 518 N.E.2d 82, 90.

■ When a defendant intentionally uses a deadly weapon upon a victim, it may properly be inferred that he intended to cause the victim's death. (*People v. Salazar* (1988), 126 Ill. 2d 424, 449, 535 N.E.2d 766, 776.) However, death may also be a natural consequence of a blow from a bare fist when there is great disparity in size and strength between the defendant and the victim, even though a bare fist is not ordinarily regarded as a deadly weapon. *People v. Brackett* (1987), 117 Ill. 2d 170, 179-80, 510 N.E.2d 877, 882 (170-pound adult male who beat an 85-year-old woman created strong probability of death or great bodily harm); *People v. Ward* (1984), 101 Ill. 2d 443, 452, 463 N.E.2d 696, 700 (adult male who beat a four-year-old child with his fists and a mop handle was not merely acting recklessly).

In *People v. Drumheller* (1973), 15 Ill. App. 3d 418, 304 N.E.2d 455, the defendant was convicted of murdering a 14-month-old child. The evidence in that case revealed that the defendant struck the child in the stomach and jerked him off the floor. The child died of peritonitis caused by an explosive rupture of the stomach from blunt trauma. The court concluded that, based on defendant's conduct in striking the baby and on evidence of previous abuse, the jury could properly infer that defendant possessed the requisite mental state for murder. *Drumheller*, 15 Ill. App. 3d at 421, 304 N.E.2d at 457-58.

■ Murder convictions have been affirmed for cases of child abuse involving more than a single blow when coupled with a history of child battering. In *People v. Mifflin* (1984), 120 Ill. App. 3d 1072, 458 N.E.2d 1343, this court upheld a murder conviction of a 14-month-old child whom defendant struck and threw across a room into

a crib. The victim in *Mifflin* had sustained a total of 21 bruises as well as several burns within the week before he was admitted to the hospital for his fatal injury. (*Mifflin*, 120 Ill. App. 3d at 1075, 458 N.E.2d at 1344-45.) In addition, the defendant admitted slapping the boy near the top of his head; and also admitted throwing the child at the crib, with the child striking the guard rail and falling to the floor. (*Mifflin*, 120 Ill. App. 3d at 1076, 458 N.E.2d at 1345.) The trial judge concluded the acts of defendant slapping the child in the head with a "sweeping backhand" and throwing him across the room caused his death. *Mifflin*, 120 Ill. App. 3d at 1076, 458 N.E.2d at 1346.

Likewise, in *People v. Szerletich* (1980), 86 Ill. App. 3d 1121, 408 N.E.2d 1098, a murder conviction was affirmed based on defendant's hitting a one-year-old child in the head three or four times. Finally, in *People v. Jones* (1986), 140 Ill. App. 3d 660, 671-72, 488 N.E.2d 1363, 1371, a "very severe beating" to a four-year-old victim which lasted 10 or 15 minutes coupled with previous abuse was found to demonstrate that defendant knew his acts created a strong probability of death or great bodily harm.

■ Defendant's repeated verbal abuse of Ryan may be viewed as demonstrating both defendant's hatred of Ryan and defendant's wish to seriously harm him. A person who is driven by his bad temper to injure or kill another acts knowingly or intentionally, not recklessly. In this case, the evidence was sufficient to prove defendant wanted to hurt Ryan badly, and defendant succeeded in doing so. The jury reasonably inferred that defendant possessed the state of mind required for first degree murder based on the combination of the 70 foot-pound blow and the deliberate acts of physical mistreatment defendant inflicted upon Ryan. In addition, defendant's multiple and conflicting versions of how Ryan's injuries occurred could properly be viewed as indicative of defendant's guilty knowledge. We conclude the evidence presented at trial was not so improbable or unsatisfactory that it created a reasonable doubt of defendant's guilt when viewed in the light most favorable to the State.

### III

Defendant also argues that the trial court committed reversible error by giving the following instruction:

"When you retire to the jury room you first will elect one of your members as your foreperson. He or she will preside during your deliberations on your verdict.

Your agreement on a verdict must be unanimous. Your ver-

dict must be in writing and signed by all of you, including your foreperson.

The defendant is charged with the offense of First Degree Murder. Under the law, a person charged with First Degree Murder may be found not guilty, or may be found guilty of First Degree Murder, or guilty of Involuntary Manslaughter.

You are to decide based upon the evidence and the law in this case whether to return a verdict of not guilty, a verdict of guilty of First Degree Murder, or a verdict of guilty of Involuntary Manslaughter.

Accordingly, you will be provided with three verdict forms: 'not guilty', 'guilty of First Degree Murder', and 'guilty of Involuntary Manslaughter.'

From these three verdict forms, you should select the one verdict form that reflects your verdict and sign it as I have stated. Do not write on the other two verdict forms. Sign only one of these verdict forms.

If you find the State has proved the defendant guilty of both First Degree Murder and Involuntary Manslaughter, you should select the verdict form finding the defendant guilty of First Degree Murder and sign it as I have stated. Under these circumstances, do not sign the verdict form finding the defendant guilty of Involuntary Manslaughter."

This instruction is Illinois Pattern Jury Instructions, Criminal, No. 26.01Q, at 367-68 (2d ed. Supp. 1989) (hereinafter IPI Criminal 2d (Supp. 1989)). Defendant specifically complains of its last paragraph, which informs the jury that if it finds that the State has proved defendant guilty of both first degree murder and involuntary manslaughter, it should sign *only* the verdict form finding defendant guilty of first degree murder. Citing *People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335, defendant argues that this instruction misstates the law. We agree.

*Hoffer* involved a jury trial in which the defendant was charged with murder, voluntary manslaughter, and involuntary manslaughter. The jury returned verdicts finding him guilty of all three offenses. (*Hoffer*, 106 Ill. 2d at 189, 478 N.E.2d at 337.) The supreme court noted the State's argument that the jury's action was not inconsistent because it was instructed that defendant was charged " 'with the offense of murder, which includes the offenses of voluntary manslaughter and involuntary manslaughter.' " (*Hoffer*, 106 Ill. 2d at 193, 478 N.E.2d at 339, quoting Illinois Pattern Jury Instructions, Criminal, No. 2.01 (2d ed. 1981) (hereinafter IPI Criminal 2d).) The State also

pointed out that the jury was given six forms of verdict—a guilty and a not guilty verdict form as to each charge—and *not* told that it could return a guilty verdict on only one of the charges. See IPI Criminal 2d No. 26.01. *Hoffer*, 106 Ill. 2d at 193, 478 N.E.2d at 339.

The supreme court rejected the State's argument that the mental state required for murder " 'subsumed the lesser mental states required for voluntary manslaughter and involuntary manslaughter,' " and held that the jury verdicts were legally inconsistent. (*Hoffer*, 106 Ill. 2d at 194, 478 N.E.2d at 339.) In so holding, the court deemed the mental state necessary to sustain a conviction for involuntary manslaughter to be less culpable than, and mutually inconsistent with, the mental states necessary to sustain a conviction for murder. (*Hoffer*, 106 Ill. 2d at 194-95, 478 N.E.2d at 340.) "Where a determination is made that one exists [recklessness], the others [intent or knowledge], to be legally consistent, must be found not to exist." (*Hoffer*, 106 Ill. 2d at 195, 478 N.E.2d at 340.) The court concluded that because "the jury concluded that the defendant killed another, intentionally or knowingly (murder, voluntary manslaughter) while simultaneously finding that defendant recklessly but unintentionally caused the death of the victim (involuntary manslaughter)," a new trial on all counts was required. *Hoffer*, 106 Ill. 2d at 195, 478 N.E.2d at 340.

While *Hoffer* dealt with murder as defined in section 9—1 of the Code prior to the enactment of first degree murder pursuant to Public Act 84—1450, effective July 1, 1987 (1986 Ill. Laws 4222, 4228-32), we note that the new offense of first degree murder essentially incorporates all of the law previously applicable to the offense of murder. (See Haddad, *Second Degree Murder Replaces Voluntary Manslaughter in Illinois: Problems Solved, Problems Created*, 19 Loy. U. Chi. L.J. 995 (1988); O'Neill, *An Analysis of Illinois' New Offense of Second Degree Murder*, 20 J. Marshall L. Rev. 209 (1986).) Thus, we conclude that the *Hoffer* analysis is fully applicable to the new first degree murder statute.

In its introductory note to chapter 26.00 of the 1989 supplement to IPI Criminal 2d, the Illinois Supreme Court Committee on pattern jury instructions in criminal cases (Committee) cites *Hoffer* as one of several instances in which a confused jury returned logically or legally inconsistent verdicts. The Committee explained that its extensive modifications to instruction No. 26.01 were designed to avoid such problems in the future. (IPI Criminal 2d ch. 26.00, Introductory Note, at 317 (Supp. 1989).) Under the new form of instruction Nos. 2.01Q and 26.01Q (which are designed for use in cases, such as the present one, in which the jury is instructed on both first degree murder and

involuntary manslaughter), the jury is no longer told that one offense "includes" another; further, the jury is now told to sign only one verdict form. (IPI Criminal 2d Nos. 2.01Q, at 42; 26.01Q, at 367-68 (Supp. 1989).) These changes thus address two of the concerns specifically discussed by the supreme court. *Hoffer*, 106 Ill. 2d at 189, 193, 478 N.E.2d at 337, 339.

■ The Committee's goals are laudable and it has otherwise achieved them through its promulgation of the series of instructions for IPI Criminal 2d Nos. 2.01 and 26.01 in the 1989 supplement. However, the present case provides an instance where the modifications go too far. Thus, in cases like the present one, in which the jury has before it not only greater and lesser offenses, but a lesser offense having the less culpable mental state of recklessness, the last paragraph of IPI Criminal 2d No. 26.01Q (Supp. 1989) should *not* be given. The court's giving of that last paragraph in the present case was, therefore, error.

■ However, because defendant raised no objection to this instruction, either in the conference on instructions or in his post-trial motion, and failed to tender his own instruction in lieu of the objectionable one that was given, this error is waived on appeal unless it so affects defendant's substantial rights that it rises to the level of plain error. (*People v. Holman* (1984), 103 Ill. 2d 133, 176-77, 469 N.E.2d 119, 140.) In *People v. Herrett* (1990), 137 Ill. 2d 195, the Illinois Supreme Court recently discussed the criteria reviewing courts should employ when deciding whether alleged plain errors, affecting substantial rights, may be noticed on appeal under Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)). The court wrote the following:

> "The plain error rule permits a reviewing court to consider a trial error not properly preserved for review in two circumstances. First, where the evidence in a criminal case is closely balanced, a reviewing court may consider a claimed error not properly preserved so as to preclude argument of the possibility that an innocent man may have been wrongly convicted. * * *
> * * *
> The plain error rule also may be invoked where the error is so fundamental and of such magnitude that the accused was denied a fair trial." *Herrett*, 137 Ill. 2d at 209-10.

In applying these criteria to the present case, we note that immediately after reading the erroneous instruction to the jury, the court stated the following:

> "In other words, ladies and gentlemen, there are three forms of verdict. Only one of these should be signed by all of you. As

I have stated, involuntary manslaughter is an included offense, which means the elements of involuntary manslaughter are included in murder, and so *if*, in theory, *you should find him guilty of murder, that would necessarily mean under the law not guilty of involuntary manslaughter and not vice versa. If he were guilty of involuntary manslaughter, he would necessarily be not guilty of murder*, and then you have the not guilty form if you find he is not guilty of either of those offenses." (Emphasis added.)

In compliance with Supreme Court Rule 451(c), the trial court should refrain from clarifying instructions orally from the bench unless the parties have otherwise agreed. (107 Ill. 2d R. 451(c); Ill. Rev. Stat. 1987, ch. 110, par. 2—1107(a).) Nevertheless, the trial court's explanation was a correct statement of the law. Under *Hoffer*, the mental states for first degree murder and involuntary manslaughter are mutually exclusive. Accordingly, under these circumstances, a guilty verdict based upon one mental state necessarily finds the defendant not guilty of the charge which is based upon the other mental state. Thus, if the jury finds the defendant guilty of first degree murder, it is necessarily finding him not guilty of involuntary manslaughter; and likewise, if the jury finds the defendant guilty of involuntary manslaughter, it is necessarily finding him not guilty of first degree murder.

As we noted earlier, the IPI Criminal 2d No. 26.01 series of instructions, appearing in the 1989 supplement, should reduce the likelihood of inconsistent verdicts by instructing the jury that it is to sign only one verdict form. Nonetheless, *all* of the issues instructions in IPI Criminal 2d at some point state (as did the involuntary manslaughter issues instruction in this case), "If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (See, *e.g.*, Illinois Pattern Jury Instructions, Criminal, No. 7.08, at 67 (2d ed. 1981).) In accordance with this issues instruction, a jury which finds a defendant guilty of first degree murder might look in vain for a verdict form to sign indicating that the jury has found the defendant not guilty of involuntary manslaughter. However, the only verdict forms the jury would have to choose from would be the following: "We, the jury, find the defendant _____ guilty of first degree murder." "We, the jury, find the defendant _____ guilty of involuntary manslaughter." and "We, the jury, find the defendant _____ not guilty." (See IPI Criminal 2d Nos. 26.01Q, at 367-68; 26.05, at 400-01; 26.02, at 397-98

(Supp. 1989).) There is no verdict form available specifically finding defendant not guilty of involuntary manslaughter. Thus, we conclude that an instruction informing the jury in writing of what the trial judge stated orally in this case might be both appropriate and desirable.

The issue of whether the omission of a portion of a jury instruction constitutes plain error was considered in *People v. Almo* (1985), 108 Ill. 2d 54, 483 N.E.2d 203. In *Almo*, the trial court failed to read the jury the "fourth proposition" of the then-murder instruction which provided that the State must prove " '[t]hat the defendant did not believe that circumstances existed which justified the use of the force which he used.' " (*Almo*, 108 Ill. 2d at 64-65, 483 N.E.2d at 207, quoting Illinois Pattern Jury Instructions, Criminal, No. 27.01 (1968).) The defendant in *Almo* argued that the jury did not realize that the mental states for murder and voluntary manslaughter are inconsistent. Therefore, defendant claimed it was likely to return convictions on both counts. *Almo*, 108 Ill. 2d at 65, 483 N.E.2d at 207.

The supreme court deemed this argument to be speculative and further found that, although the jury may have been initially confused, the trial court's additional instruction alleviated any problem before any verdicts were entered. *Almo*, 108 Ill. 2d at 65, 483 N.E.2d at 208.

■■ So too in the present case, the trial court explained the proper procedure for the jury to follow. In addition, the prosecutor stated during closing argument that the offenses before the jury were mutually exclusive. Last, we note that this record contains no indication that the jury *in fact* ever found that the State had proved defendant guilty of *both* first degree murder and involuntary manslaughter, thereby causing the erroneous portion of IPI Criminal 2d No. 26.01Q (Supp. 1989) to be activated. According to the supreme court's analysis in *Hoffer*, because the mental states involved in these offenses are mutually exclusive, a jury ought *not* reach any such conclusions (even though, as in *Hoffer* itself, juries on rare occasions do just that). Given all of the circumstances before us, we conclude that the trial court's giving of the erroneous instruction did not rise to the level of plain error.

## IV

Defendant next contends that the trial court committed reversible error when it allowed the State to present "other crimes" evidence. Specifically, defendant argues that (1) the State failed to show that the marks on the victim's brother, Ray, were inflicted by defendant,

and (2) the photographs of Ray were highly inflammatory and unduly prejudicial.

 █ Evidence showing that a defendant committed a crime for which he is not on trial is improper when its purpose is to show the defendant's propensity to commit crime. (*People v. Stewart* (1984), 105 Ill. 2d 22, 61, 473 N.E.2d 840, 859.) However, evidence of other crimes is admissible to prove *modus operandi*, intent, identity, motive, absence of mistake, or any relevant purpose other than to show defendant's propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 823-84.) Before such evidence may be introduced, it must be shown that the crime or behavior actually occurred and that the defendant committed it or participated in its commission. Such proof, however, need not be beyond a reasonable doubt. *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 488-89, 485 N.E.2d 1292, 1298-99.

The three photographs, People's exhibit Nos. 12, 14, and 15, depict Ray on the day of Ryan's death. Exhibit No. 12 is a picture of Ray's face which shows round red marks on his upper left cheek and lower right cheek, as well as a bruise on his chin. Exhibit Nos. 14 and 15 are photographs of a three-inch-long red mark on Ray's ear.

The evidentiary foundation for these photographs consisted of both the testimony of Cindy Summers and Officer Baker. At trial, Cindy stated that she disciplined her children by hitting their hands or buttocks, although defendant encouraged her to slap them hard instead. When defendant disciplined Ryan and Ray, he would strike the sides of their heads. According to Cindy, defendant hit Ray one week before Ryan's death.

Officer Baker testified about an interview he conducted with defendant the day after Ryan was beaten. In this interview, defendant explained that he had "tapped" all of the children, including Ray, on the side of the head and that he may have struck one of the children in the ear.

In *People v. Milner* (1984), 123 Ill. App. 3d 656, 463 N.E.2d 148, evidence of defendant's abuse of three children was admitted in the case where defendant was charged with the murder of a fourth child. The evidentiary foundation for this testimony consisted of defendant's admission that he had shaken these children and medical evidence revealing the similarity of injuries suffered by the deceased and the other children. *Milner*, 123 Ill. App. 3d at 661-62, 463 N.E.2d at 153.

Similarly, in *People v. Wachal* (1987), 156 Ill. App. 3d 331, 509 N.E.2d 648, witnesses observed and defendant admitted to hitting the deceased child on several occasions. The court determined that the

probative value of this evidence outweighed the danger of any prejudicial effect in light of defendant's own admissions. *Wachal*, 156 Ill. App. 3d at 337, 509 N.E.2d at 653.

■■ The trial court's decision regarding the admissibility of evidence of other crimes will not be disturbed on review unless it constitutes a clear abuse of discretion. (*People v. Phillips* (1984), 128 Ill. App. 3d 457, 460, 470 N.E.2d 1137, 1139.) We conclude that under the circumstances of this case, evidence that defendant struck the deceased's two-year-old brother about the head at a time reasonably contemporaneous with the blows defendant allegedly struck the 19-month-old victim on his head, causing his death, is probative of the defendant's state of mind as he performed these acts. Further, we find that the testimony of Cindy Summers and Officer Baker is sufficient to establish that defendant was the person who struck Ray on the side of the head. Accordingly, the trial court did not abuse its discretion in admitting this "other crimes" evidence.

## V

■■ Defendant additionally argues that he was denied the effective assistance of counsel because his attorney failed to object to (1) the jury instruction discussed in part III of this opinion, (2) a police officer's statement that defendant's statement kept changing, (3) evidence that defendant verbally abused Ryan and Ray, and (4) Dr. Hanigan's demonstration explaining the force of 70 foot-pounds. The test of whether an attorney's performance was ineffective is two-pronged. A defendant must show that the attorney's performance "fell below an objective standard of reasonableness," and must demonstrate that he was prejudiced by counsel's deficient performance. *Strickland v. Washington* (1984), 466 U.S. 668, 688, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.

■■ We conclude, based upon our careful review of this record, that defendant received vigorous, diligent, and sound representation. Most of the claims made to the contrary by defendant's counsel on appeal involve rulings by the trial court that had an objection been made, it would have been properly overruled.

As an example, defendant maintains that he was denied the effective assistance of counsel when his attorney failed to object to Officer Roberts' "opinion" that defendant's statement kept changing. The plain fact is that based upon the statements of defendant that Roberts related to the jury, defendant's version of events *did* keep changing. Hence, no prejudice is shown.

■■ We also reject defendant's argument that evidence indicating

he repeatedly called Ryan and Ray vulgar names was more prejudicial than it was probative. Proof of defendant's dislike of these children tends to show that Ryan died by criminal, not by accidental, means. The evidence of defendant's outrageous verbal abuse toward these toddlers speaks eloquently of defendant's likely mental state as defendant struck Ryan on his head to "discipline" that 19-month-old child.

■■ Defendant next contends that defense counsel's failure to object to Dr. Hanigan's physical demonstration regarding the amount of force with which Ryan was hit constituted ineffective assistance. The trial court has a wide degree of discretion in ruling upon the appropriateness of courtroom demonstrations, and the exercise of that discretion will not be interfered with unless it has been abused. *People v. Rose* (1979), 77 Ill. App. 3d 330, 334, 395 N.E.2d 1081, 1085.

At trial, Dr. Hanigan demonstrated the force of a blow equal to 70 foot-pounds. In preparation for this demonstration, Dr. Hanigan hooked up his hand to a variety of gauges in order to replicate the correct amount of force. This demonstration was highly probative of the amount of force defendant inflicted upon Ryan because the meaning of 70 foot-pounds is not likely known to the typical layperson. The trial court's decision to allow Dr. Hanigan's demonstration was within its discretion. Accordingly, defense counsel did not deny defendant effective assistance of counsel by failing to object to this demonstration.

■■ Last, defendant again raises the question of the improper instruction, IPI Criminal 2d No. 26.01Q (Supp. 1989). As we stated in part III of this opinion, the notion that the erroneous portion of this instruction had any effect in this case is entirely speculative. Further, the error was in an approved IPI Criminal 2d instruction, thereby leading counsel to think that it was a correct statement of the law.

None of these complaints comes close to demonstrating ineffective assistance of counsel.

Affirmed.

LUND and GREEN, JJ., concur.