10 December 1999

NO. 4-96-0525

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from 

Plaintiff-Appellee, ) Circuit Court of 

v. ) Sangamon County

BRADLEY L. ADAMS, ) No. 95CF482

Defendant-Appellant. )

) Honorable

) Thomas R. Appleton,

) Judge Presid­ing.

_________________________________________________________________

JUSTICE KNECHT delivered the opinion of the court:

After a jury trial in April 1996, de­fen­dant, Bradley Adams, was found guilty of four counts of first degree mur­der, one count of ag­gravated battery, and one count of con­ceal­ment of a homi­cide.  720 ILCS 5/9-1(a), 12-4(a), 9-3.1 (West 1994).  In June 1996, the court va­cat­ed the ag­gra­vat­ed bat­tery convic­tion and im­

posed an extended term of 65 years' im­pris­onment for first de­gree mur­der and a con­secu­tive 5-year term for con­ceal­ment of a homi­cide.  De­fen­dant appeals, arguing (1) the trial court abused its discre­

tion in admitting evidence of his prior miscon­duct; (2) the trial court erred in fail­ing to compel the testimo­ny of a defense wit­

ness; (3) the State improp­erly com­mented on his postarrest si­lence; (4) the evi­dence was in­suf­fi­cient to sup­port his con­vic­tion for first degree mur­der; and (5) the trial court improperly con­sid­ered an ag­gra­vat­ing factor in imposing his sen­tence.   We af­firm in part, vacate in part, and remand with di­rec­tions.

I. BACKGROUND

In August 1995, defendant was charged with first degree murder, ag­gravated battery, and con­ceal­ment of a homi­cide in con­

nec­tion with the February 1995 death of his girl­friend, Molly Sullivan.  In March 1996, the trial court held a pretrial hear­ing on a mo­tion by the State to admit evi­dence of defendant's prior mis­con­duct.  At the hear­ing, the State called Eva Golterman to tes­

tify about an inci­dent be­tween her and de­fen­dant in the fall of 1993.   

In October 1993, Golterman and de­fen­dant were en­gaged to be mar­ried and lived in sepa­rate units at the Park West Apart­ment com­plex (Park West) in Springfield, Illinois.  Golterman de­scribed an incident when she and defen­dant were leaving Park West.  Golterman stopped to check her mail and found a let­ter ad­dressed to her from Fran­cis Krupka.  Golterman opened the let­ter in defen

dant's pres­ence and read the first few sen­tences, which indi­cated defen­dant and Krupka were in­volved in a homo­sexu­al rela­tion­ship.  Defen­dant grabbed the let­ter and ran to his apart­ment.  Golterman followed and asked defendant to return the let­ter.  When defen­dant re­fused, Golterman con­front­ed him about his al­leged rela­tion­ship with Krupka.  Golterman then at­tempt­ed to grab the let­ter, but de­

fendant pinned Golterman's arm be­hind her back.  Golterman man­aged to break free and again asked about the al­leged rela­tion­ship.  Defen­dant vio­lent­ly grab­bed Golterman's throat for more than a min­

ute, kicked her in the abdo­men and pushed her to the apart­ment floor.  Golterman then left defendant's apart­ment.  The trial court granted the State's mo­tion, finding such evidence admissible.

The evidence presented at trial established the follow­

ing.  On Feb­ru­ary 25, 1995, David Stoner, Fran­cis Krupka and the victim, Molly, at­tended a party at de­fendant's Park West apart­ment.  At about 8 p.m., Molly and Krupka had a con­ver­sa­tion in the bed­

room.  Defen­dant and Stoner re­mained in the liv­ing room.  While Molly and Krupka con­versed, Mary White, Molly's best friend and neighbor of de­fen­dant, arrived.  After briefly talking with de­fen­

dant and Stoner, Mary went to the bed­room and noticed Molly was upset.  Mary and Molly left the party and walked to Mary's apart­

ment.  Molly told Mary about her con­versation with Krupka and spe­

cif­i­cally recount­ed Krupka stated he was in love with de­fen­dant.  Molly ulti­mately re­turned to defendant's apart­ment.

Sometime after Molly's return, de­fen­dant, Krupka and Molly were in the kitch­en.  Suddenly, defendant pushed Krupka against the wall.  Molly in­ter­vened and ques­tioned de­fen­dant about his con­duct.  De­fen­dant re­leased Krupka and re­turned to the couch in the liv­ing room.  Krupka fol­lowed defen­dant and sat on the floor in front of defendant.  When Molly saw how de­fen­dant and Krupka were sitting, she stat­ed "This is sick.  I'm going home."  Molly gath­ered her be­long­ings, and she and Stoner left the apart­ment at about 11 p.m.  Stoner walked Molly to her vehi­cle and then drove home.

Louis Poppenhouse testified he was using the laundry facilities at Park West on February 26, 1995.  At about 1:30 a.m. Poppenhouse heard two men, whom he described as intoxi­cated, argu­

ing and shout­ing near the VFW build­ing, which is lo­cated di­rect­ly east of the Park West com­plex.  Poppenhouse called the police after hear­ing sev­eral noises he de­scribed as "bang­ing against a metal build­ing."  As he waited for the police, Poppenhouse heard one of the individuals yell "Motherfucker.  Why did you do it?  I'm going to kill you."  Be­cause of his location, Poppenhouse could not iden­

tify the indi­vid­u­als. 

Robert Heaton, a police officer, re­spond­ed to Poppenhouse's 911 call.  When Heaton arrived, he no­ticed a white male near the VFW building.  Upon seeing Heaton's vehicle, this individual immedi­ately turned and entered the build­ing in which defendant's apart­ment was lo­cat­ed.  Heaton de­scribed the man as ap­

proxi­mately 5 feet 9 inch­es tall and weigh­ing be­tween 180 and 200 pounds.  Defen­dant was then 5 feet 8 inches tall and weighed ap­prox­i­mate­ly 200 pounds.  Heaton, along with fellow police offi­cer Brad Sack, later dis­cov­ered the body of a de­ceased white fe­male lying in the VFW parking lot about 10 feet from the VFW build­ing.  The body was identi­fied as Molly at about 1 p.m. that day.

Several individuals talked to de­fen­dant on the morning of February 26 con­cern­ing Molly's where­abouts.  Ac­cord­ing to Molly's mother, Hel­en, de­fen­dant stated Molly left his apart­ment the night be­fore and had not re­turned.  She and de­fen­dant ex­changed a series of tele­phone calls and, each time, defen­dant insist­ed Molly had to be with her friend Mary.  In their last con­versa­tion, defen­dant said the body of a woman had been found in the park­ing lot but, given the de­scrip­tion, the woman could not have been Molly.  Defen­

dant also told Mary White and her hus­band, David, he had no knowl­

edge of Molly's whereabouts.

Mary Cullen and Julie Sullivan, sisters of the victim, went to defendant's apartment some­time be­fore 11 a.m.  Defendant and Krupka were in the apartment.  When Cullen and Julie asked de­

fen­dant about Molly's where­abouts, de­fen­dant re­peated­ly replied the "fucking niggers" killed her.  Cullen and Julie saw some of Molly's per­son­al be­longings ly­ing around de­fendant's apart­ment, including her necklace, rings, shoes, and purse.

Springfield de­tec­tives Charles Cox and Doug Wil­liam­son also talked to defendant.  They stat­ed de­fen­dant ap­peared in­toxi­cat­ed and be­came irate and verbally abu­sive when ques­tioned about Molly's where­abouts.  According to the detec­tives, defen­dant re­

peatedly yelled at them to look for the "fucking niggers" who killed Molly and denied knowing her location. 

Pursuant to a search warrant executed later that day, po­

lice sei­zed vari­ous items of evi­dence from defen­dant's apart­ment, in­clud­ing Molly's be­long­ings and cloth­ing worn by de­fen­dant the pre­vi­ous eve­ning.  De­fen­dant was sleep­ing when the war­rant was execut­ed, but awoke be­fore the po­lice left.  After he awoke, de­fen­

dant was in­formed the woman found in the park­ing lot was Molly.  Defen­dant imme­diately turned to the offi­cers and asked "Am I under arrest?"  Cox asked de­fen­dant why he would be under ar­rest.  Defen­

dant again be­came bel­lig­erent and ver­bal­ly abu­sive.  The detec­tives sug­gested defendant come to the police station after he re­laxed and then left the apart­ment.

The detectives inter­viewed defen­dant that evening at the po­lice station, but were un­able to ob­tain any in­for­ma­tion because defen­dant was still belligerent.  They con­duct­ed a final inter­view on Feb­ru­ary 28, 1995, at the home of defendant's fa­ther.  Defen­dant was then fully coop­era­tive and main­tained he did not know what hap­

pened to Molly.

After Golterman recounted the October 1993 inci­dent, Drs. Joan Barrenfanger and Edmund Donoghue testi­fied on the cause of Molly's death.  Dr. Barrenfanger, a pa­tholo­gist, ex­plained the upper por­tion of Molly's right arm had been frac­tured.  She con­

clud­ed the frac­ture oc­curred be­fore Molly's death and, after re­

view­ing X rays with an or­thope­dic sur­geon, de­ter­mined the inju­ry was char­acter­istic of a fall.  She also noted Molly had aspi­rat­ed. ­While un­able to de­ter­mine the exact cause of death, Dr. Barrenfanger concluded within a rea­son­able degree of medical cer­

tainty Molly had died of asphyx­ia­tion.

On cross-examination, Dr. Barrenfanger explained the ef­

fects of Kugelberg-Welander dis­ease, a form of muscular dys­trophy that afflicted the upper por­tion of Molly's body.  ­Molly's condi

tion would have caused extreme weak­ness in her chest, arms and hands and the muscles around Molly's ribs and dia­phragm would have been deteriorating, which, in her opinion, would have inhibited her ability to breath.

Dr. Barrenfanger further described markings on Molly's upper body.  She highlighted bruis­ing, spe­cifi­cally an abra­sion on the right side of Molly's neck.  She con­clud­ed this abra­sion could have been caused by Molly's neck­lace seized from defendant's apart­

ment.  She out­lined several phys­i­cal char­ac­ter­is­tics she would ex­

pect to find on a person who had died of stran­gula­tion, such as con­junc­ti­va hemor­rhages around the eyes, hem­or­rhag­ing around the muscles and bones of the neck, a break of the hyoid bone, and ab­normali­ties around the trachea and larynx.  Dr. Barrenfanger's exam­ination of Molly failed to un­cover any of these fea­tures.  She stat­ed no par­ticu­lar dam­age to the throat and the hyoid bone is visi­ble in ap­prox­i­mate­ly two-thirds of all stran­gula­tion cases.  Al­though acknowledging the mark on Molly's neck was con­sistent with the neck­lace, Dr. Barrenfanger stat­ed, if Molly had been stran­gled with this item, she would have ex­pected to find a longer abra­sion as well as de­fense wounds.  Dr. Barrenfanger found no evidence of de­fense wounds.

Dr. Barrenfanger also explained "compres­sion­al as­phyxi­

ation," which occurs when a person is unable to breath properly due to con­tin­ued compres­sion of the rib cage.  She stat­ed, in light of Molly's mus­cu­lar anom­a­ly, the necessary weight to suffo­cate her would be less than re­quired to suffocate an indi­vidual with a nor­

mal muscular structure.  She said com­pres­sion­al as­phyx­ia­tion could have been the cause of Molly's death, but conceded no evi­dence existed to support this find­ing.

Dr. Donoghue, a forensic pathol­o­gist from Cook Coun­ty, Illinois, con­duct­ed a ret­ro­spec­tive re­view of 25 stran­gu­la­tion cases to iden­tify­ dif­fer­ent types of inju­ries on the human body.  He noted three dis­tinct types of cas­es: (1) in­stanc­es where only ex­ter­nal inju­ries were pres­ent; (2) instanc­es where only internal injuries were present; and (3) in­stanc­es where both ex­ter­nal and in­ter­nal inju­ries were present.  Upon re­view­ing Molly's au­top­sy mate­ri­als, Dr. Donoghue testified with­in a rea­sonable degree of medical certain­ty Molly died of stran­gu­lation.  The marks on Molly's neck were con­sis­tent with having been made by her neck­lace, and, in his opin­ion, were caused by the neck­lace being pressed against the neck when she was was stran­gled.

On cross-examination, Dr. Donoghue conceded he would have been better informed if he participated in the examination of Molly's body.  He none­the­less stat­ed any differ­ence would have been in­con­sequen­tial be­cause the find­ings of Dr. Barrenfanger were suf­

fi­ciently compe­tent to make an accu­rate determination.  He ac­knowl­

edged, with the exception of the abra­sion on the neck, the autop­sy mate­rials re­vealed no other indicia of strangu­la­tion.  He disagreed with Dr. Barrenfanger's charac­terization of the neck abra­sion as triv­ial be­cause, in his opinion, even small inju­ries to the neck can be sig­nifi­cant.  He concluded the abra­sion in this case re

vealed the cause of death as stran­gula­tion.

Out­side the presence of the jury, defen­dant called Krupka as a wit­ness.  Krupka was asked to de­scribe his ac­tivi­ties on the eve­ning of February 25, 1995, and early morn­ing hours of Febru­ary 26.  Krupka asserted his fifth amendment rights and de­clined to answer.  De­fense coun­sel asked­ the trial court to com­pel Krupka to testify claiming he had been granted immu­nity by the State.  Defen­dant tendered a prof­fer of immu­ni­ty exe­cuted by the State, Krupka and his attorney, and an order en­tered by Judge Leo Zappa pur­port­

ing to grant Krupka immu­nity.  The State main­tained the order mere­

ly authorized a grant of immunity and, al­ternative­ly, any grant thereof had not been ef­fectuated because Krupka failed to comply with the terms of its proffer.  After hear­ing argument, the court deter­mined Judge Zappa's order did not grant Krupka immunity and, in any event, any grant of immuni­ty had not been effectuated.  Defendant's re­quest to com­pel Krupka's tes­ti­mony was denied.

Defendant testified on his own behalf.  He initially denied attacking Golterman in October 1993, and then described the events of February 25 and 26. He claimed Molly re­turned to his apart­ment after leaving with Stoner and they discussed the com­ments made by Krupka earlier that evening.  At some point, Molly turned and began to walk away from de­fen­dant.  De­fen­dant at­tempt­ed to grab Molly's shoul­ders as she turned but inad­ver­tent­ly grabbed the back of her neck­lace, caus­ing it to break and fall to the floor.  Defen­

dant re­triev­ed the neck­lace and tried to fix it at the liv­ing room table, while Molly stood di­rectly be­hind him.  De­fen­dant contin­ued the discus­sions and, in an effort to console Molly, turned to hug her.  When he turned, they stum­bled to the floor, caus­ing defendant to fall on Molly's chest. 

Defendant sat on Molly's chest as he con­tin­ued to dis­cuss the situ­a­tion con­cern­ing Krupka.  After three min­utes, de­fendant ob­served no reac­tion from Molly and realized she was de­ad.  Krupka tele­phoned a short time later and later ar­rived at the apart­ment.  After arguing whether they should call the police or seek medical attention, they decided to drive Molly to the hos­pi­tal.  Defen­dant car­ried Molly's body to the VFW park­ing lot and placed her in the pas­sen­ger seat of his vehi­cle.  He believed Krupka would drive Molly to the hospi­tal and claimed he saw Krupka drive his car out of the park­ing lot.  Once Krupka left, defen­dant ran back to his apart­ment and passed out on the couch.

Defendant detailed several conversations with Molly's friends and family members the morn­ing of Feb­ru­ary 26 and his later dis­cus­sions with po­lice.  He ac­knowl­edged lying on each occasion about Molly's where­abouts and the events of Febru­ary 25 and 26.  He explained he was un­truthful because he pan­icked and was afraid no­

body would be­lieve him.  Although defendant accept­ed re­spon­si­bili­ty for Molly's death, he stated he never intended to kill her and maintained her death was an accident.

Following his tes­ti­mony, defendant again tried to call Krupka as a wit­ness.  The trial court, after argument, again de­nied defendant's request.  The jury returned a ver­dict of guilty on all six counts.

II. ANALYSIS

A.  Evidence of Defendant's Prior Misconduct

Defendant first contends the trial court erred in ad­mit­

ting Golterman's testimony on the October 1993 inci­dent.  He argues (1) this evidence was not rele­vant as to wheth­er he mur­dered Molly and (2) any pro­ba­tive value was great­ly out­weighed by its prej­u­di­

cial effect.  The State main­tains the evi­dence was rele­vant to prove crimi­nal in­tent, lack of acci­dent, and so­bri­ety.

Generally, evi­dence of other crimes or wrongs is not ad­

mis­sible for the purpose of show­ing the defendant's dis­posi­tion or pro­pen­si­ty to commit such conduct.  
Such evi­dence is ad­mis­si­ble, when rele­vant to estab­lish 
in­tent, motive, or ab­sence of mistake or accident, or for any pur­pose other than to show a pro­pen­sity to com­mit crime.  
People v. Illgen
, 145 Ill. 2d 353, 364-65, 583 N.E.2d 515, 519 (1991).  
The admissibil­ity of evidence at trial is a matter left to the sound discretion of the trial court, and this court will not overturn the trial court's decision absent a clear abuse of dis­cretion.
  
Peo­ple v. Harper
, 251 Ill. App. 3d 801, 804, 623 N.E.2d 775, 777 (1993)

We find Golterman's testimony was relevant.  Defendant ad­mit­ted causing Molly's death, but main­tained it was acci­dental.  The State re­futed defendant's acci­dent claim, argu­ing he stran­gled Molly after being confronted with alle­ga­tions of a homosexu­al rela­tion­ship with Krupka.  Tes­timony of the Octo­ber 1993 inci­dent pro­

vid­ed in­sight on defendant's reac­tions when con­front­ed with allega­

tions of homo­sexu­al­ity and was rele­vant to show defendant's state of mind at the time of Molly's death and refute any claim of acci­

dent.  De­fendant stresses one iso­lated abu­sive epi­sode to­ward one person can­not be con­strued as a in­tent to injure another or be a valid basis for refut­ing a later claim of acci­dent to­ward that person.  Un­like in­stanc­es where evi­dence of prior mis­con­duct is in­

tro­duced to show 
modus
 
operan­di
, or that the crime was part of a common de­sign or plan, the degree of identity be­tween the two of­

fenses is not necessary when such evidence is offered for some other pur­pose.  
When, as here, evi­dence of prior mis­con­duct is of­

fered to prove intent or the ab­sence of acci­dent, mere gen­eral areas of simi­larity will suf­fice.  
Illgen
, 145 Ill. 2d at 373, 583 N.E.2d at 523.  

Al­though the victims and end re­sults dif­fer, the cir­cum­

stanc­es sur­round­ing the attack of Golterman and the death of Molly are striking­ly simi­lar.  The dif­fer­enc­es be­tween the two inci­dents do not elim­inate the relevancy of Golterman's tes­ti­mo­ny.  More­over, given the charge to the jury to receive Golterman's testi­mony for the limited purpose of de­ter­mining defendant's intent, knowl­edge, intoxication, and acci­dent, the pro­ba­tive value of such evi­dence was not sub­stan­tial­ly out­weighed by any prej­u­di­ce to defen­dant.  See 
People v. Evans
, 125 Ill. 2d 50, 83, 530 N.E.2d 1360, 1374 (1988).  Accord­ingly, we find no abuse of dis­cretion.

B. Krupka's Immunity

Defendant next contends he was denied a fair trial when the trial court refused to compel Krupka's testimony.  Under the prof­fer, the State intended to grant­ Krupka use immu­nity under sec­

tion 106-2.5(b) of the Code of Crim­inal Proce­dure of 1963 (Code) (725 ILCS 5/106-2.5(b) (West 1994)) in ex­change for full cooper­a­

tion in its investigation of Molly's death.  The State intended to grant Krupka immu­ni­ty on the condi­tion he pro­vid­ed "
com­plete and truth­ful in­for­ma­tion to law en­force­ment offi­cials re­garding crim­

inal con­duct and ev­ery­thing he knows or has reason to be­lieve about the crimi­nal con­duct of others."  In addi­tion, Krupka was re­quired "to produce any and all docu­ments and physi­cal evi­dence of any kind in his possession or under his control which relates to the in­for­

mation he pro­vides."  The State argues the grant of immu­nity was con­tingent upon Krupka's full coop­era­tion with in­vestigating author­ities and ex­press­ly pro­vided "the State [would] be re­lieved of its obliga­tion[] [to grant immunity] should [Krupka] fail to be entirely candid and forth­right in providing informa­tion."

Sec­tion 106-2.5(b) of the Code au­tho­riz­es a court, upon mo­tion of the State, to order "a wit­ness be granted [use] immuni­ty from prose­cu­tion in a crimi­nal case as to any informa­tion direct­ly or indi­rectly de­rived from the pro­duction of evi­dence from the wit­

ness if the witness has refused or is likely to re­fuse to produce the evidence on the basis of his or her priv­i­lege against self-in­

crimination."  725 ILCS 5/106-2.5(b) (West 1994).  Use immunity granted under section 106-2.5 ­is different than a grant of trans­

actional immu­nity found in sections 106-1 and 106-2 of the Code.
  Transactional immunity affords broader protec­tion from fu­ture pros

ecution than use immunity and acts to com­plete­ly bar the State from prosecut­ing an immu­nized witness for any of­fenses to which the immunity relates.  
On the other hand, a grant of use immu­ni­ty does not act as an abso­lute bar from prose­cution but, rather, prohibits the State from using any evidence obtained under the grant of immuni­ty, or leads de­rived from that evidence, against the immu

nized wit­ness in a later criminal proceed­ing.  
Peo­ple ex rel. Cruz v. Fitz­ger­ald
, 66 Ill. 2d 546, 549, 363 N.E.2d 835, 836-37 (1977).

We believe immunity was conferred upon Krupka by the agreement.  The State suggests the order entered by Judge Zappa merely approved the process of granting immunity, but Krupka would have received immunity 
only
 if he complied with the terms of the agreement and cooperated with the police.  It would appear Krupka, after receiving immunity, failed to cooperate or provide expected information.  The State argues the immunity was never consummated because of this lack of cooperation.  We disagree.  On April 24, 1996, Judge Zappa entered an order that granted Krupka use immu

nity.  Nothing further needed to occur.  The State may not have received any benefit from the grant of immunity, but the law does not permit the State, in these circumstances, to withdraw the immu

nity because it is not satisfied with the level of cooperation of the witness.

Each prosecutor in each county of our state may have a different process for negotiating for a grant of immunity, strik­ing an agreement, seeking an order of court and then deciding how to proceed.  This case presents interesting questions on the best procedure to follow, but we need not address what constitutes the best practice.  Here, Krupka was granted immunity and the defendant was entitled to call him as a witness.  The trial court erred when it denied defendant's request to compel Krupka's testimony.

We also conclude this error does not require reversal.  We note de­fense coun­sel did not know how Krupka would have re

sponded to his questioning.  Defense counsel ­advised the trial court he had not spo­ken with Krupka prior to tri­al.  Defense coun

sel simply maintained Krupka's testi­mo­ny would have been "of sub­

stan­tial value to the defen­dant."  Defendant asserts in his brief Krupka's testimony would have substantially corroborated his ver

sion of events.  Nothing in the record supports this contention.  Defendant's own testimony indicated Krupka did not return to defendant's apartment until 
after
 Molly died.  Whether Krupka's tes­ti­mo­

ny would have been fa­vor­able to defendant's case is entirely specu­

la­tive.  Defendant does not know what Krupka would have said on the witness stand. Defendant was not denied a fair trial when he was not permitted to call Krupka as a witness.

C. Prosecutorial Comments

Rely­ing on 
Doyle v. Ohio
, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), defendant contends he was de­nied a fair trial when the State made im­proper refer­ences to his postar­rest si­

lence at trial.  During its cross-examination of defen­dant, the State focused on the lies he told immediately after Molly's disap­

pear­ance and his admission at trial he caused her death.  The State further remarked in closing argument de­fendant carried his lies into the courtroom by obtaining the State's pretrial evidence to formulate his accident defense.  Ac­cord­ing to de­fen­dant, the State's comments amount­ed to an at­tack on his con­sti­tu­tional right to re­main si­lent.  We dis­agree. 

Under 
Doyle
, the pros­e­cu­tion may not use an accused's postarrest si­lence to im­peach an excul­patory story offered for the first time at trial.  
Doyle
, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244.  Here, however, the State challenged defendant's credibility.  The State high­light­ed defendant's nu­mer­ous mis­state­

ments to both au­thori­ties and Molly's family mem­bers to raise the in­fer­ence defendant's ex­cul­pato­ry claim was a mere fab­rica­tion.  When read in con­text, the ques­tion­s and re­marks were ref­er­enc­es to the course of lying de­fen­dant un­der­took after the February 25 inci­

dent and not, as defen­dant contends, references to his right to remain silent. 

D. Sufficiency of Evidence

Defendant also contends the State failed to prove him guilty of murder beyond a rea­sonable doubt. 
When presented with a challenge to the sufficiency of the evidence, a reviewing court, considering the evidence in a light most favorable to the State, is limited to determining whether any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.  
People v. Oaks
, 169 Ill. 2d 409, 457-58, 662 N.E.2d 1328, 1349-50 (1996).  A defendant's con­vic­tion will not be set aside un­less the evi­dence is so im­proba­ble or unsatis­fac­tory as to create a rea­son­able doubt of the defendant's guilt.  
People v. Gilliam
, 172 Ill. 2d 484, 515, 670 N.E.2d 606, 620 (1996).    

To convict defendant of first de­gree mur­der, the State was re­quired to prove beyond a reason­able doubt at least one of the following: defendant (1) in­tend­ed to kill or do great bodi­ly harm, (2) knew his acts would cause death or great bodi­ly harm, (3) knew his acts cre­at­ed a strong prob­abili­ty of death or great bodily harm, or (4) was committing the offense of aggra­vated battery when Molly died.  Defendant specif­i­cally con­tends the evi­dence fails to show he pos­sessed the req­ui­site state of mind in caus­ing Molly's death.  Men­tal states, such as the in­tent to kill or to cause great bodi­ly harm, are not common­ly estab­lished by di­rect evi­dence and may be inferred from the char­acter of the defendant's conduct and the circum­stances sur­round­ing the commis­sion of the offense.  
Peo­

ple v. Summers
, 202 Ill. App. 3d 1, 10, 559 N.E.2d 1133, 1138 (1990).

Con­struing the evidence in a light most favorable to the State, we find the evi­dence suffi­cient to support defendant's mur­

der con­vic­tion.  Defendant's conduct pre­ceding Molly's death, and his actions the following day, suggest he had the requi­site crim­i­

nal culpability.  De­fen­dant and Molly dis­cussed the issue of defen

dant's homosexu­ali­ty imme­diate­ly be­fore Molly's death.  The record high­lights defen­dant's vio­lent temper when con­front­ed with such accusa­tions.  De­fen­dant acknowl­edged he knew something was wrong with Molly on the eve­ning of February 25 yet did not seek medi­cal treat­ment.  Instead, he wait­ed for Krupka to ar­rive at his apart­

ment so they could dis­cuss how to handle the situ­a­tion.  When ­later asked about Molly's where­abouts by au­thori­ties and sever­al mem­bers of Molly's fami­ly, defendant lied, claiming he had not seen Molly since she left his apartment the night of February 25 and must be with friends at some other loca­tion.  De­fendant fur­ther main­tained Molly was murdered by a group of un­named indi­vidu­als at a time when Molly's where­abouts were un­known and be­fore the woman found in the park­ing lot had been identi­fied.  Upon being in­formed the woman had been identi­fied as Molly, de­fen­dant imme­di­ate­ly asked in­ves­ti­gat­ing offi­cers if he was under ar­rest.

In addition, the physical evidence and medical testimo­ny suggest Molly was stran­gled.  Both pathologists described the bruis­ing and abra­sions on the right side of Molly's neck and con­

clud­ed these mark­ings were consis­tent with the neck­lace seized from defendant's apart­ment.  Dr. Donoghue opined the mark­ings resulted from pres­sure being applied on the neck­lace and conclud­ed Molly's death was caused by stran­gula­tion.  Although Dr. Barrenfanger was un­able to determine the exact cause of Molly's death, she never eliminated the possi­bili­ty of stran­gula­tion.  Defendant stresses sev­er­al of the at­trib­utes char­ac­ter­istic of stran­gu­lation were not pres­ent in Molly's case.  Howev­er, accord­ing to Dr. Barrenfanger, no par­ticu­lar dam­age would be visible to the hyoid bone or other areas of the throat in ap­prox­i­mate­ly two-thirds of such cas­es.  More­over, Dr. Donoghue testified, in some cases, the vic­tim would not sustain any in­ternal injuries.  Al­though Dr. Barrenfanger stat­

ed Molly could have died from com­pres­sional asphyxiation, neither she nor Dr. Donoghue found any evi­dence to support such a find­ing.

The jury was re­spon­si­ble for as­sess­ing the cred­i­bil­i­ty of the witness­es, the weight to be given their testi­mony, and the infer­ences to be drawn from the evi­dence.  
The determina­tion of how Molly died rest­ed with the jury, and it was not required to ac­cept defendant's excul­patory claim that her death was an acci­dent.  
See 
Gilliam
, 172 Ill. 2d at 515-16, 670 N.E.2d at 621 (jury need not "ac­cept any pos­sible expla­nation com­patible with defendant's inno­

cence and ele­vate it to the sta­tus of rea­sonable doubt").  Given the circumstances of Molly's death and the medi­cal testimo­ny, we conclude a ra­tio­nal trier of fact could have found de­fendant guilty of first degree murder beyond a rea­sonable doubt.

E. Sentencing

Defendant finally argues the trial court erred in im­pos­

ing sentence when it found "
the 
conduct
 
here
 caused seri­ous harm."  (Emphasis added.)  We disagree.  As evident by the above statement, the court con­sid­ered the nature and man­ner of defendant's ac­tions in caus­ing Molly's death, and not the death it­self, in fixing pun­

ish­ment.  
See 
Peo­ple v. Saldivar
, 113 Ill. 2d 256, 271, 497 N.E.2d 1138, 1144 (1986).  
Accordingly, we find no abuse of dis­cretion in defendant's sen­tence.  
Illgen
, 145 Ill. 2d at 379, 583 N.E.2d at 526.

III. CONCLUSION

For the foregoing reasons, defendant's conviction and sentence for murder are affirmed.  However, only the convic­tion on the most serious charge, count I, may stand.  We there­fore va­cate the murder convictions on counts II, III, and IV (see 155 Ill. 2d R. 366(a)(5)) and remand the cause for issuance of an amended judg­

ment of sentence showing the murder conviction is on count I.

Affirmed in part and vacated in part; cause remanded with di­rections.

STEIGMANN and GARMAN, JJ., concur.