THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DALE MIFFLIN, Defendant-Appellant.

Fourth District No. 4—83—0205

Opinion filed January 5, 1984.

Fuller, Hopp, Barr & McCarthy, P.C., of Decatur (Glenn O. Fuller, of counsel), for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE TRAPP delivered the opinion of the court:

Following a bench trial, defendant Dale Mifflin was convicted of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(2)) and sentenced to 25 years' imprisonment. Defendant appeals from this judgment of the

circuit court of Champaign County. We affirm.

Defendant raises three issues on appeal: (1) whether he was proved guilty beyond a reasonable doubt, (2) whether his trial counsel was incompetent, (3) whether the trial court abused its discretion by sentencing him to 25 years' imprisonment.

On July 26, 1982, at 6:25 p.m., defendant called for an ambulance saying that he had a baby who was not breathing. When the ambulance arrived the 14-month-old child was unconscious, gasping in a labored manner, his pupils fixed and dilated. The child did not respond to verbal or physical stimuli. Defendant told ambulance personnel that the child was normal during the day but had a convulsion prior to his call for the ambulance. En route to the hospital, the child commenced decerebrate posturing indicative of increased cranial pressure. His breathing became more labored and his respiratory and pulse rates dropped. The child developed respiratory arrest at the hospital and was revived. An operation was performed to remove blood clotting from the head and relieve intercranial pressure. After several days on life-support equipment, the child, Sean Mifflin, died. Defendant, the child's father, was indicted on the offenses of murder and involuntary manslaughter.

Dr. Bobowski, pathologist, performed an autopsy on Sean. He testified that the cause of death was cerebral death due to edema resulting from some trauma. The external examination of the child revealed "multiple bruises actually from the head to the toes." Internal examination revealed several additional injuries caused by blunt injuries or blows inflicted from a minimum of 24 hours to a week or longer before the child was admitted to the hospital.

A paramedic testified that she heard defendant tell a doctor at the hospital that he had been holding the child and had tightened his grip when Sean started to slip from his arm. When he looked down, the child was choking with his eyes rolled back into his head and defendant dropped the child.

Dr. Belber, neurosurgeon, operated on Sean on the night of July 26. Belber opined that the severe brain swelling was caused by a physical trauma delivered to the head. As there was no scalp laceration, area of swelling or softness, or visible skull fracture, he was unable to determine what portion of the head received the trauma. The injury, caused by a "severe blow or blows," was not consistent with the child's head being caught by an adult's arm. Belber estimated that the brain swelling would have taken two to three hours to develop and that the injury occurred between noon and 2 p.m. on July 26.

Dr. Baird testified he had examined Sean at 6:40 p.m. on July 26.

At that time, the injury had developed and the pressure within the head was so high that the child's death was imminent. Baird also observed a series of bruises over the child's body: (1) a bruise lateral to the left eye between the eye and the ear, two to three days old; (2) a bruise on the right lower eyelid region on the cheek bone, three to four days old; (3) two to three separate bruises on the right forehead, two or three days old; (4) a bruise on the right cheek below the eye, three or four days old; (5) six bruises on the upper half of the back, from 3 to 14 days old; (6) a bruise on the back thigh at least two weeks old; (7) a bruise on the lower right hand portion of the abdomen, 5 to 14 days old; (8) four bruises on the back of the lateral left side of the chest, normally covered by the arm, from two to five days old; (9) two sets of parallel fingerprint bruises on the inner right arm, one set three to four days old and the other set one or two days old; (10) a bruise on the front of the right leg, one day old; and (11) older bruising over the entire lower back. Baird also noted burn scars on the boy's left hand; a large second degree burn on the front heel of the hand, one or more weeks old; and second or third degree burn scars on the back of the distal joints of the middle and small fingers, several days old. Baird opined that the bruises and injuries on a whole were not self-inflicted and that the overall pattern of bruising and burns were characteristic of child abuse. He commented: "Someone has been beating the living daylights out of this child for a period of two to three weeks."

Champaign police officer Kenneth Griffin spoke to defendant at the hospital on July 26. Griffin testified that defendant said he had unintentionally choked Sean with his arm when the child slipped from his hip that afternoon. Defendant also told Griffin that the night before he had thrown Sean across the room at his wife, a distance of about six feet.

Ronald Rasmus, investigator for the Department of Children and Family Services (DCFS), testified that he told defendant he believed something had happened to Sean on July 26 before he was brought to the hospital. Defendant told Griffin he "was hoping that wouldn't come out, but something did happen on Monday." Defendant told Rasmus that when his wife went to work around 12:30 p.m., he went home. He became upset while talking to his wife on the telephone. He hit Sean in the head with the back of his hand, picked him up, carried him into the bedroom, and threw him on the floor. He then returned to the living room and watched television. When he later took Sean to the kitchen to fix a bottle, the child slipped through his arm and defendant compressed Sean against his side until he finished prepar-

ing the bottle. When he laid the child down in the bedroom, Sean was having trouble breathing and defendant called the ambulance.

Dr. Jeckel, psychiatrist, testified that he met defendant and his wife the day after the child's hospitalization. At that time, both parents were overwhelmed by the sudden psychological trauma of the previous day. He opined that it would have been difficult for defendant to give a complete statement of the events in the circumstances. It was Jeckel's opinion that defendant did not intend to harm the child as seriously as he did.

Mrs. Mifflin, defendant's wife, offered various explanations for the bruises over the child's body but had no explanation for the burns. She said she bathed Sean the morning of July 26 but did not notice bruises under his arm or on his back.

Defendant testified and described tossing the child across the floor at his wife on July 25. He admitted slapping the boy near the top of his head on July 26, demonstrating the blow in court. He also admitted throwing the child at the crib from a distance of three to five feet, with the child striking the guard rail and falling to the floor. Defendant testified that Sean appeared to be fine when he later took the child to the kitchen to fix him a bottle. Defendant stated that when the child reached for something in the sink, he began to slip through defendant's arm and defendant tightened his grip. When he took the child to the bedroom, the child began having convulsions and he called the ambulance.

Defendant testified that the bruises on the child's body were not from being hit, but he offered no explanation for the burns. Defendant stated that he had not intended to cause his son great bodily harm or death and had never knowingly performed actions likely to cause great bodily harm or death.

Dr. Baird testified on rebuttal that the child could not have appeared normal at 6 p.m. Baird explained that, if the trauma was caused by defendant's acts, the stages of coma could occur over a period of 4 to 12 hours, during which time the child could not be moving around, playing or making noises.

Judge Steigmann concluded that the acts of the defendant in the early afternoon of July 26, striking the 14-month-old with a sweeping backhand blow and throwing the child toward the crib, caused the child's death. The trial judge found the testimony of the expert medical witnesses to be credible, probative and persuasive. He found the testimony of defendant and Mrs. Mifflin was not believable on several matters. The trial court found defendant guilty of the offense of murder and not guilty of the offense of involuntary manslaughter.

Defendant suggests that in order to sustain a conviction of murder under section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(2)) it must be shown that the defendant (1) performed an act which had the direct and natural tendency to destroy another life, and (2) was consciously aware that such a result was practically certain to be caused by his conduct. Defendant urges that a murder conviction cannot be sustained merely upon a showing that the defendant knew his conduct created a strong probability of great bodily harm. Defendant cites *People v. Muir* (1977), 67 Ill. 2d 86, 365 N.E.2d 332, *overruled on other grounds in People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28. Both *Muir* and *Harris* considered the distinction between murder and attempt murder. In *Harris* the court held that it is not sufficient to prove *attempt murder* to show that the accused intended to cause serious bodily harm. *Attempt* requires specific intent to kill; *murder* does not. In *Harris*, the court stated: "The crime of murder is thus committed not only when a person intends to kill another individual, but also when he intends to do great bodily harm (par. 9—1(a)(1)), or when he knows that his acts create a strong probability of death *or great bodily harm* (par. 9—1(a)(2)), or when he is attempting or committing a forcible felony (par. 9—1(a)(3))." (Emphasis added.) (72 Ill. 2d 16, 23-24, 377 N.E.2d 28, 31.) To sustain a murder conviction under section 9—1(a)(2), there must be evidence from which the trier of fact could infer that the defendant knew, *at minimum*, that his acts created a strong probability of great bodily harm to another individual; that the defendant acted; and that the act resulted in the death of another.

To sustain a murder conviction all that need be proved is that the defendant voluntarily and wilfully committed an act, the natural tendency of which was to destroy another's life or inflict great bodily harm. It is a well-accepted principle that intent can be implied or inferred from the character of the act. (*People v. Szerletich* (1980), 86 Ill. App. 3d 1121, 408 N.E.2d 1098.) The distinction between murder and involuntary manslaughter rests in the degree to which the acts defendant performed risk death or great bodily harm. Whether the particular acts of the defendant create a "strong probability" of death or great bodily harm or whether they are "likely" to cause death or great bodily harm is a question of fact to be decided under all the circumstances as presented to the trier of fact. *People v. Johnson* (1975), 33 Ill. App. 3d 168, 337 N.E.2d 240.

Defendant urges that the trial judge employed the wrong standard in determining his guilt, by assuming that the State only needed to prove the defendant knew his acts created a strong probability of

great bodily harm "which did not have a tendency to destroy another life." Defendant contends that there is no indication that the trial judge required or found proof that the acts of the defendant had a direct and natural tendency to destroy life. Defendant further urges that the court did not recognize the principles enunciated in *People v. Crenshaw* (1921), 298 Ill. 412, 131 N.E. 576, *People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468, or *Muir*. As previously mentioned, *Muir* was overruled by *Harris*. *Harris* focused on a distinction between attempt murder and murder which is not applicable here. The record in this case reflects that Judge Steigmann discussed several cases distinguishing murder from involuntary manslaughter before reviewing the evidence in this case. (*People v. Farmer* (1977), 50 Ill. App. 3d 111, 365 N.E.2d 177; *People v. Palmer* (1979), 76 Ill. App. 3d 1014, 395 N.E.2d 713; *People v. Gresham* (1979), 78 Ill. App. 3d 1003, 398 N.E.2d 398; *People v. Drumheller* (1973), 15 Ill. App. 3d 418, 304 N.E.2d 455.) These cases correctly state the law on the sufficiency of the evidence to sustain a charge of murder.

■ Defendant contends that his murder conviction cannot stand since there was no external evidence of any blunt trauma related to the cerebral edema, *i.e.*, no skull fracture. We disagree. The child sustained a subdural hematoma and brain swelling which ultimately caused his death. The focus of inquiry for the trier of fact is the nature of the acts which lead to the death, not whether doctors are able to show the point of impact. Defendant further argues that his acts did not have a direct and natural tendency to destroy the child's life because he did not hit his son with a closed fist. Acts other than a closed-fisted blow may support a murder conviction.

Dr. Belber estimated that the injury which caused the brain swelling occurred between noon and 2 p.m. on July 26. He suggested that the injury was caused by a severe blow or blows. The child was in defendant's custody during that time period. Defendant admitted striking the child on the head and throwing him across the room at the crib. No other explanation for the head injury was advanced. Judge Steigmann heard the testimony and saw defendant demonstrate the blow he delivered to his son's head. The determination of guilt is supported by the record.

■ Defendant next contends that he did not receive effective assistance of counsel at trial in that his counsel misunderstood the legal and factual issues in the case and failed to offer an appropriate defense. Defendant's trial counsel pursued a theory of lack of intent or knowledge. Defendant's counsel on appeal, when arguing the post-trial motion, acknowledged that intent or knowledge was important.

On appeal, he argues that the defense should have focused on medical testimony on the force necessary to produce the resulting injuries and whether defendant's acts had a tendency to destroy life. To support this argument, defendant presents the affidavit of Dr. Pearson. Judge Steigmann found that testimony in accordance with the affidavit would have been substantially cumulative to medical testimony presented at trial. We agree. Pearson's affidavit does not suggest that defendant's acts would not cause the injuries which led to the death in this case. Defendant also urges that the failure of his trial counsel to consult an expert medical witness led to ineffective cross-examination of Dr. Belber. The record indicates there was lengthy cross-examination of Belber by defendant's trial counsel.

Defendant also contends that his trial attorney failed to interview and call witnesses on issues material to the case, namely his parents and a baby sitter. At the hearing on the post-trial motion, defendant's counsel was unable to formulate any argument for the relevance of the baby sitter's testimony. Judge Steigmann found that the failure to call defendant's parents as witnesses was a matter of trial tactics.

To prevail on a claim of ineffective assistance of counsel the defendant must clearly establish: (1) actual incompetency of counsel, as reflected by the manner of carrying out his duties as a trial attorney; and (2) substantial prejudice resulting therefrom, without which the outcome would probably have been different. (*People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203; *People v. Stepheny* (1970), 46 Ill. 2d 153, 263 N.E.2d 83; *People v. Royse* (1983), 99 Ill. 2d 163.) The determination of the reviewing court is made based upon the totality of defense counsel's conduct and the circumstances of the case, not upon isolated incidents. (*Greer; People v. Gallardo* (1983), 112 Ill. App. 3d 764, 445 N.E.2d 1213.) Errors in judgment or trial strategy do not establish incompetency. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) The record in this case does not reflect ineffective assistance of counsel.

Finally, defendant contends that the sentence of 25 years' imprisonment imposed in this case constitutes an abuse of discretion. He asks this court to reduce his punishment to the minimum of 20 years under Supreme Court Rule 615(b)(4) (87 Ill. 2d R. 615(b)(4)). In pronouncing sentence, the trial judge stated that he had considered all the statutory factors in aggravation and mitigation, the nature and circumstances of the offense, the history and character of the defendant, the mitigating evidence offered by defendant, and the arguments of counsel. We have consistently held that it is not our function to serve as a sentencing court, and we will not substitute our judgment

for that of the trial court merely because we would have balanced the appropriate factors differently if the task of sentencing had been ours. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

Affirmed.

GREEN and MILLER, JJ., concur.