# Illinois Official Reports

## Appellate Court

*People v. Oelerich*, 2017 IL App (2d) 141281

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK D. OELERICH, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-14-1281 |
| Filed | February 1, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 12-CF-3502; the Hon. James K. Booras, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Paul J. Glaser, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Lawrence M. Bauer, and David A. Bernhard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Presiding Justice Hudson and Justice Hutchinson concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a jury trial, defendant, Mark D. Oelerich, was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2012)) and aggravated driving under the influence of cannabis (DUI) (625 ILCS 5/11-501(d)(1)(F) (West 2012)). He was sentenced to concurrent terms of 24 years' imprisonment for first degree murder and 14 years for aggravated DUI. On appeal, defendant contends that his conviction of murder should be reduced to reckless homicide (720 ILCS 5/9-3(a) (West 2012)) because the State failed to prove beyond a reasonable doubt the *mens rea* for murder. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    The indictment charged that, on or about November 21, 2012, defendant committed first degree murder in that he drove his vehicle at approximately twice the posted speed limit, intentionally crossed the center divider, crashed into a vehicle that was going in the opposite direction, knew that his act created a strong probability of death or great bodily harm to another, and caused the death of Aracely Villasenor. Defendant was also charged with three counts of aggravated DUI, all based on the allegation that he had driven with cannabis in his system, thereby killing Villasenor (625 ILCS 5/11-501(d)(1)(F) (West 2012)) and causing great bodily harm to two children, Isabel Romero and Jeremy Suarez (625 ILCS 5/11-501(d)(1)(C) (West 2012)).

¶ 4    We summarize the trial evidence. David Prus, a Round Lake police officer, testified as follows. On November 21, 2012, at approximately 9:15 a.m., he arrived at the scene of a traffic crash on Cedar Lake Road, which runs north-south with a lane going each way and, at the time, had a posted speed limit of 35 miles per hour. A white Cadillac was in the northbound lane, facing northeast; a dark Nissan Quest minivan was in the southbound lane. The Cadillac's airbags had been deployed, and it had very heavy front-end damage. Prus exited his squad car and walked toward the Cadillac. The air bags obscured his view of the interior, but he saw a hand appear between an airbag and the driver's-seat window. Prus tried to open the driver's door but could not. He told the driver to stay still. Prus then walked toward the Nissan; the front end was heavily damaged and was emitting smoke. The driver, Villasenor, was pinned to her seat by the steering wheel, and the dashboard had been pushed forward, trapping her. She did not respond to Prus's attempt to speak with her. An infant was in a car seat, and two older children sat in the rear. Prus took the three minors out; Villasenor was extricated later.

¶ 5    Prus testified further that he returned to the Cadillac and saw that the driver was gone. Walking to the rear of the car, Prus saw defendant walking south, away from the scene. Sergeant Robert Bell had arrived on the scene and ran after the man. Learning later that the driver of the Cadillac had been taken into custody, Prus notified the department's major-crash action team.

¶ 6    Bell testified as follows. He saw defendant walking away by himself. Defendant did not appear to be trying to run away or hide from Bell. Bell caught up to defendant and told him to stop. Defendant did not look at Bell but kept looking straight ahead and continued walking. Defendant had blood on or near his lip, was smoking a cigarette, and was not wearing shoes. Bell got in front of defendant and started walking backward, facing defendant and telling him that he needed to stop so that Bell could check on him and see that he was all

right. Defendant told Bell, " 'No. I'm fine. I don't need to stop. I'm walking home.' " They continued walking. Defendant kept staring ahead but not looking at Bell. At one point he said, " 'My name is Robert Paulsen.' " He also said, " 'I am walking to Italy.' " Bell called for backup. He continued to walk backward in front of defendant, threatening to use force and telling him numerous times, " 'You are going to stop.' " Defendant responded, " 'No, I'm not.' "

¶ 7    Bell testified that he and his backup, Officer Segreti, each took one of defendant's arms and tried to take him into custody. As Bell tried to put defendant's arm behind him, defendant began to pull away from the officers and move forward. The officers put him onto the ground. They tried to put his arms behind him and told him to stop resisting, but he kept swinging his arms and trying to stand up, and the officers kept trying to push him back down. Bell felt heavy resistance from defendant; it was difficult to keep him on the ground. At one point, Bell got onto defendant's back and struck defendant with his hands and knees, but this just increased defendant's resistance. Bell tried to put a handcuff onto defendant's left arm while Segreti held defendant's right arm; defendant did a "push up type maneuver," sending Bell flying several feet backward and landing on his elbow.

¶ 8    Bell testified that, after he got up, he ran back to assist Segreti. They struggled with defendant some more, and Segreti then tased defendant twice. Defendant staggered from the middle of the road into a ditch on the side, and the fight continued. By then, more officers had arrived. Defendant continued to resist, swinging his arms and being tased once or twice more. It took seven officers to complete taking defendant into custody. Defendant's strength that evening had been "[s]uper human [*sic*]." He had displayed "unbelievable force." Defendant was handed off to officer Brandon Gullifor and driven in an ambulance to the hospital. Bell returned to Prus and briefed him on what had just happened.

¶ 9    Gullifor testified on direct examination as follows. He helped the other officers to subdue defendant. It took about two minutes. Inside the ambulance, defendant was handcuffed to a cot but kept flailing his legs and had to be further restrained. Initially, defendant identified himself as Mark Paulsen. Gullifor asked whether he had been driving the Cadillac; defendant said yes. Gullifor asked him whether there had been any passengers; defendant said no.

¶ 10   Gullifor testified that, at the hospital, the doctor treating defendant asked him whether he had taken anything or was under the influence of anything. Defendant responded that he had smoked "K2" earlier. Gullifor recognized "K2" as a name for synthetic cannabis. He did not smell alcohol or any unusual odors coming from defendant. Gullifor also spoke to defendant's parents at the hospital. He asked them whether defendant had any medical or psychological issues. Defendant's mother said no. Gullifor then asked that the doctors obtain a blood sample, which they did. Later that morning, when defendant had been taken to the police station and placed into a holding cell, defendant provided a urine sample.

¶ 11   Gullifor testified on cross-examination that he had received only limited training on identifying narcotics. He had seen people who were under the influence of K2; they acted much as defendant had behaved. Gullifor had had only "[v]ery limited" training on identifying mental illnesses; he had not been taught that mentally ill people can exhibit extraordinary strength.

¶ 12   Gullifor testified that, in the ambulance, defendant yelled and grunted at him. He also told Gullifor that his name was Robert Paulsen and that Robert Paulsen had died in the crash. At the hospital, when defendant told the emergency-room doctor that he had smoked K2

earlier, Gullifor took him to mean earlier in the evening. He never asked defendant how much earlier or how much K2 he had smoked. Defendant also told the doctor that he had been using cannabis and texting. Later on, though, he apologized to the doctor for having lied about texting and having lied about "everything." Defendant never told the doctor that he had used dimethyltryptamine (DMT), another "designer drug."

¶ 13     In the remainder of his testimony, Gullifor stated as follows. Eventually, defendant identified himself properly. The doctor asked him, " 'What happened tonight?' " Defendant answered that he had smoked marijuana and K2 earlier. He did not mention DMT.

¶ 14     Jennifer Bash of the Illinois State Police, qualified as an expert on forensic toxicology, testified as follows. After receiving the DUI kit for defendant, she tested the urine sample for the presence of drugs and recorded the results. She concluded to a reasonable degree of scientific certainty that metabolite of tetrahydrocannabinol (THC), the active ingredient in cannabis, was present in defendant's urine. She detected only THC metabolite in defendant's urine; she saw no evidence of polysubstance abuse. She did not measure the level of THC metabolite in the urine. DMT, a hallucinogen, has a potential detection time of "upwards of six hours." Bash had tested for it once or twice. K2 is a common name for synthetic cannabinoids, for which a handful of laboratories do test, Bash testified, but not her own. These compounds do not have exactly the same effects as cannabis; K2 users can become more agitated. Bash tested defendant's blood sample for alcohol only, but there is no blood test for THC metabolite. Per laboratory policy, the blood was not tested for any drugs not detected in the urine sample.

¶ 15     Joseph Manges, a Grayslake police detective whom the court qualified as an expert on accident reconstruction, testified as follows. On November 21, 2012, he led the Lake County major crash assistance team (MCAT) investigation of the accident scene. On arriving, he saw the Cadillac on the east side of the road and the Nissan Quest on the west side; both vehicles were heavily damaged in the front. Manges walked the scene, recording various views with a video camera. The video was played for the jury. The MCAT examined both vehicles, made various measurements, and recovered information from the Cadillac's OnStar system and its crash-data retrieval system (CDR)—the Nissan Quest lacked these features. The court admitted a printout obtained by subpoena and admitted the OnStar recording.

¶ 16     The OnStar recording was played for the jury. It lasted 47 seconds. The operator initially asked defendant what had just happened. Defendant replied, "Oh, um, I was driving because I wanted to have the great DMT trip of my entire life. And I cannot die. And that everything is good in life—everything is good. Life is *** the greatest thing I've ever had in my entire life." The operator again asked defendant what had happened. He replied, "I went head-on into a car." The operator asked how many people were hurt. Defendant replied, "No one's injured."

¶ 17     Manges testified that the CDR recorded events that had occurred 2.5 seconds before the crash. The printout described "event record one" as occurring 2.5 seconds to 0.5 seconds before the crash and showed that the brake-switch circuit had been off during that period. This implied that there had been no braking at all until 0.5 seconds before impact.

¶ 18     After being qualified as an expert in accident reconstruction, Roger Barrette testified as follows. On November 21, 2012, he arrived at the crash scene at about 11:15 p.m. Barrette supervised the measurements, photographed the scene, and inspected the two vehicles. The MCAT found several gouge marks showing where the maximum force in the collision had

occurred. Barrette also received data from the MCAT, including information from the Cadillac's CDR, which had recorded approximately 2.5 seconds of precrash data and 0.5 seconds of postcrash data. At the time of impact, the two vehicles' "closing speed"—how fast they were approaching each other—was approximately 84 miles per hour. The Cadillac had been going between 65 and 71 miles per hour, the Nissan approximately 14 or 15 miles per hour. The posted speed limit was 35 miles per hour. The force of the Cadillac hitting the Nissan "went straight through the center mass" of the Nissan, pushing it straight back from the right portion of its lane to a resting position on the gravel shoulder about 50 feet from the point of impact. It was angled toward the right, indicating that the driver had steered it to the right within moments of impact. The Cadillac also came to rest about 50 feet from the point of impact, but it had rotated about 300 degrees to the east, meaning that it had originally been facing slightly to the northwest.

¶ 19   Barrette testified that he had concluded that there had been "no braking [of the Cadillac] leading up to the time of impact." The brake lights were off "all the way up to impact." Within a second before impact, the Cadillac's driver "steered rapidly and hard" to the left and into the Nissan, the driver of which had braked and steered to the right.

¶ 20   Pete Molidor, a Round Lake police lieutenant, testified on direct examination as follows. On November 22, 2012, he was asked to interview defendant at the Lake County jail. Molidor had learned that defendant did not want to talk to anyone in authority and wanted to discuss only the Bible. Molidor brought along Eric Wang, a police detective, to help build rapport with defendant. They met defendant and presented him with a *Miranda* waiver form, which he read aloud and signed. The interview was recorded and lasted approximately an hour and 12 minutes. Afterward, defendant wrote out a brief statement. The next day, the officers interviewed him for about eight minutes.

¶ 21   The statement was admitted into evidence. It read, in full, "Hung out at my brothers [*sic*]. Smoked my weed. I drove home. Grabbed my mother's car and drove it into another car off I20 [*sic*]." Molidor testified that, before the interview, he had not heard the OnStar recording or any of defendant's statements relating to DMT.

¶ 22   We summarize the recorded interview as it is pertinent here. Crying and moaning, defendant told the officers that he felt that he had lost God and was letting his demons run his life. The officers asked defendant, who was naked, whether he wanted to cover himself; he said that he was comfortable and declined. Defendant expressed regret that he had treated his parents and his girlfriend, Tracy Rubel, badly. He said, "I know I've had multiple abortions" and "just kept repeating it." The officers told him that he could still turn his life around if he truly repented.

¶ 23   Half an hour into the interview, Molidor asked defendant about the events of November 21, starting with his time at his brother Michael's house. Defendant recounted that he had gone over and that Michael and his roommate Johnny were there. They were grilling food outdoors, and defendant got high on marijuana. Defendant kept getting signs; someone was calling him. He "felt the calling" and "had to do it." Wang asked what "it" was. Defendant explained that he was referring to taking his life. He said that he had felt that he had to show that he was "dedicated" to the "calling." He noted his "bad intentions" and said that it was "like the lottery."

¶ 24   Defendant said that, after he left Michael's house, he drove his truck home, spoke briefly to his father, and picked up his mother's Cadillac. At this point, defendant told the officers

that he had "no idea how any of this works." Asked to what he was referring, he said, "this reality." He added that he had thought that he had received a calling from God to do something. Wang asked defendant whether he had stopped anywhere, such as to get gas or cigarettes. Defendant said that he stole a pack of cigarettes from a Shell station and got gas for his Suzuki motorcycle. He then drove away and eventually crashed into the Nissan. He told the officers, "I thought it was nothing." He exited the Cadillac via the passenger-side door.

¶ 25    At this point in the interview, defendant broke down and cried, covered his face with his hands, and repeatedly said, "Who did I kill?" The officers said that he had not killed anyone, at least not yet. Molidor asked, "How did it happen?" Defendant responded, "How did what happen?" Molidor said, "the accident" and asked defendant why he had felt that he had to hit the other vehicle. Defendant said that he had felt a "calling." Asked to explain, he added, "that we are fully conscious beings and that we cannot die." Wang asked whether defendant had been trying to test this "calling." Defendant agreed that he had. He had felt that "something was calling [him]"; he had thought that it was God.

¶ 26    Molidor noted that, after the crash, defendant had told an officer that he had been smoking marijuana and K2. Defendant explained that he had thought that the officer asked whether he had (ever) smoked K2, so he said yes; but that evening, he had smoked only marijuana. Molidor again asked why he had crashed his car into the Nissan. Defendant responded that he had been trying to test whether he was invincible. Asked again how the crash had occurred, defendant said that he steered the Cadillac into the other lane and drove head-on into the Nissan.

¶ 27    Wang told defendant that he could pray with him. Wang joined hands with defendant; he asked God to guide defendant and had defendant repeat after him that, in the name of Jesus, he cast the spirits of the devil out and that these evil spirits no longer could command his life. Molidor then asked defendant to write down an account of the crash. Defendant did so. He also expressed regret for an accident that had happened in October 2012 when he had been texting while driving and then lied to an officer about it. The interview concluded.

¶ 28    In the supplemental interview, Molidor showed defendant the *Miranda* waiver that he had signed, and defendant said that he remembered it. Defendant then said that, on November 21, 2012, he had been driving his mother's Kia. Asked whether he had been texting on November 21, 2012, defendant said that he had been texting during the incident in October. Defendant initially agreed with Molidor's suggestion that he had not been texting on November 21, 2012. But when Molidor asked the question again, defendant said, "I was texting and driving." Molidor asked whether defendant was referring to the accident in October or the crash "two nights ago." Defendant said that he meant the incident "two nights ago."

¶ 29    Molidor showed defendant a diagram of the position of the vehicles after the crash and asked him how his car had gotten to where it had ended up. Defendant responded, "I swerved." Molidor asked whether he had done that on purpose or because of texting. Defendant responded, "I said because of texting but I did I guess on purpose." Molidor asked, "You guess you did it on purpose or you did it on purpose?" Defendant paused a few seconds and said that he "did it on purpose." Molidor asked him again whether he had been texting, but defendant did not give him a direct answer, and Molidor did not pursue the matter further.

¶ 30    Molidor testified on cross-examination as follows. When he first observed defendant at the jail, about 23 hours after the crash, defendant was alone in his cell. He was naked, on all fours, banging his head against the wall, spitting and moaning. Defendant signed the *Miranda* waiver about 5 or 10 minutes after Molidor saw him; he was still naked and remained so during the interview. Molidor had previously interviewed naked suspects four times in 20 years. Molidor had "[v]ery little" training in identifying mental illnesses or their symptoms. While observing defendant before the interview, Molidor did not think that he had any mental illness.

¶ 31    Molidor testified that, when defendant said that he was okay with being naked during the interview, Molidor did not find this out of the ordinary. At that time, Molidor did not know whether defendant was suffering from a drug-induced psychosis, or any kind of psychosis, or whether he had any drugs in his system. Defendant had not yet been charged with murder.

¶ 32    Molidor testified that, at times, defendant was very lucid; at other times, he did not make sense. When he said that he had had multiple abortions, the officers did not ask whether he meant that literally or was referring to his girlfriend. When defendant said that "it was like the lottery," the officers did not ask him what "it" was. When he referred to what he had thought was a calling from God, the officers did not ask him to what he was referring. As of the follow-up interview, the officers had heard nothing about a Kia being involved in the case.

¶ 33    Manuel Montez, a forensic pathologist, testified that he had performed the autopsy on Villasenor. His opinion was that Villasenor's death was caused by multiple traumatic injuries that she sustained during a high-speed motor vehicle collision.

¶ 34    The State rested. Defendant called Dr. Lisa Rone, a clinical psychiatrist and professor of psychology whom the court qualified as an expert in psychiatry. On direct examination, she testified as follows. Rone had diagnosed many people with schizophrenia. She performed a comprehensive psychiatric evaluation of defendant to ascertain the extent and severity of any psychiatric illness he had had at the time of the crash. On August 29, 2013, Rone interviewed defendant for approximately two hours. He was cooperative. He had been on Haldol, an antipsychotic drug, since November 24, 2012. In addition to using the interview and various tests, Rone reviewed police records, hospital records, the OnStar recording, the videotape of defendant in jail, the videotape of the police interview, and the jail's psychiatric records.

¶ 35    Rone testified that Dr. Eugene Wasilyw, a testing psychologist, also evaluated defendant to determine whether he was feigning psychotic illness and to check for evidence of post-crash brain damage. Wasilyw administered a test that showed that defendant's intelligence quotient was in the "average" range. He also tested defendant specifically for feigning and found none. Wasilyw gave defendant the Minnesota Multiphasic Personality Inventory (MMPI). He concluded in part that, although defendant "over-reported" symptoms of psychosis, he was not feigning mental illness. Rather, his elevated scores on the scales for persecutory ideation and paranoia showed that, long after the crash, he continued to have delusional thinking about being persecuted or followed and still had paranoid thinking.

¶ 36    Rone testified that Wasilyw's administration of a Rorschach test disclosed "elevated levels of impairment in reality testing," *i.e.*, "someone who really has a difficult time evaluating objective reality, really had a break with reality." Asked whether the test showed that defendant had this difficulty, Rone testified, "Yes. It was very severe." Wasilyw

administered another test that confirmed the finding from the MMPI that defendant continued to have paranoia and feelings of persecution.

¶ 37    Rone testified that defendant's mother told her that he had a mental-health evaluation in April 2012 but discontinued treatment and tore up his insurance papers because he believed that the government could track him if he continued. Rone also spoke to Tracey Rubel. Rubel said that, beginning in March 2012, defendant had a "profound change in personality." He started doing strange things, including refusing to drink tap water or use it to brush his teeth, saying that the government was fluoridating the water in order to "make people stupid so they could be put in concentration camps." He did not want his son to have a birth certificate because he was convinced that the government would put him in the army. During the 2012 Summer Olympics, defendant believed that the government would declare martial law, and he said that he wanted to sleep with a gun in his lap for protection. He unplugged his XBox because he thought that it was wiretapped, and he slept with his cell phone in a different room because he believed that the government was using it to listen in on him. However, Rubel said, defendant never talked of committing suicide or harming another person. She said that defendant never used DMT but spoke about it "all the time" because he had seen a documentary on it. Rone testified that defendant told her that the government would place him into a FEMA camp or a concentration camp. He also said that television, music, and movies were sending messages directed specially to him. This belief was a case of "[i]deas of reference," a symptom of psychosis.

¶ 38    Rone testified that defendant told her that he had never used DMT and, on November 21, 2012, had not consumed alcohol. He said that the collision occurred because he fell asleep at the wheel. He denied having wanted to die or test his invincibility. To Rone, what defendant had said on the OnStar tape was "pretty nonsensical"; he referred to a DMT trip, talked about whether he could die, and said that nobody was injured; he was "very confused." Rone agreed that defendant correctly told the operator that he had driven head-on into a car, but she explained that a person undergoing a psychotic episode can still remember some things correctly and report accurately on what is happening at the time.

¶ 39    Rone testified that psychiatrists recognize the possibility of implanting false ideas or creating false memories in a person who is in a very vulnerable state, which can include psychosis. Rone saw evidence of this tactic "pretty much throughout" the officers' interrogation of defendant. On the jail surveillance videotape, defendant displayed considerable bizarre behavior, such as chanting, disrobing, making a mask out of a napkin, putting pieces of napkin elsewhere on his body, and talking to himself. Defendant told her that, during the interview, he experienced auditory hallucinations, including one that he interpreted as God telling him to disrobe to prove that he was in heaven and another telling him that the police were shape-shifters and that he should cooperate with them because they would hurt him. He said that the voices had scared him.

¶ 40    Rone testified that she had learned that defendant's mother had a history of depression. Two siblings were on antidepressants, and a maternal uncle had been psychiatrically institutionalized, although Rone did not know the diagnosis.

¶ 41    Rone opined that, to a reasonable degree of scientific certainty, when she interviewed defendant, he was suffering from schizophrenia, a psychiatric disorder. Schizophrenia, she explained, is an incurable disorder that affects numerous areas of the brain, causes "positive symptoms," such as auditory hallucinations and delusions, and can cause "negative

symptoms," such as withdrawal over time and loss of affect. Schizophrenics experience difficulties with cognitive and executive functioning. In its early phase, when a person is experiencing the positive symptoms, schizophrenia can "destroy the ability to form rational thoughts" and thus can interfere with the person's ability to formulate a plan and carry it out. As of his interview with Rone, defendant had never been treated for schizophrenia and, as far as she knew, had not been diagnosed with it.

¶ 42    The videotape of defendant at the jail was played in court. The tape had no audio. As it was played, Rone testified about it as follows. At one point, defendant looked up and then talked to himself, a sign that he was "hearing voices." He then walked around aimlessly and looked at the camera several times, again appearing to be hearing voices. He also adopted yoga poses and did other things to calm himself down. Such actions are common in schizophrenics, although not exclusive. They are not typically caused by cannabis, which usually has a calming effect. Some drugs, such as phencyclidine (PCP) and crack cocaine, can cause similar symptoms. However, the only drug for which defendant had tested positive was cannabis. Later on the tape, at several points, defendant walked over to a wall and hit it, then looked at the camera and started punching the walls.

¶ 43    Rone testified that defendant had told her that he had heard voices commanding him to take off his clothes. He also said that he had believed that he had to take his clothing off and keep it off throughout the interview in order to prove that he was going to heaven or was in heaven. In the video, defendant also put some pieces of napkin on himself, apparently to calm down; turned his head in strange ways, apparently attending to internal stimuli (hearing voices); and climbed onto the top bunk, grimaced, and pushed the wall, all aimless behaviors typical of psychotics' frequent regression to childlike behavior.

¶ 44    Rone testified further that, during his police interview, defendant made several inaccurate statements, sometimes "spoke in sentences that didn't make very much sense," was "confused about whether he was dead or alive," and insisted on remaining nude throughout the interview. He wrote his statement after the police had implanted ideas into him and prayed with him to cast out spirits. Defendant told her that he had looked up to the officers as religious figures.

¶ 45    Rone testified that people undergoing schizophrenic episodes can exhibit extraordinary strength. This is not typical with cannabis. A person suffering a schizophrenic episode can undergo mood swings but be able to recall some events and personal information. He could also periodically say things that appear to make sense.

¶ 46    Rone testified on cross-examination as follows. There is no objective test for the presence of schizophrenia. There is a strong hereditary aspect: a person with a first-degree relative with schizophrenia has a 10% chance of developing the disorder, but otherwise the chance is 1%. Defendant did not have a first-degree relative with schizophrenia. Rone's report stated that defendant's uncle had been psychiatrically hospitalized for depression, but Rone did not validate that diagnosis. According to the Diagnostic and Statistical Manual of Mental Disorders, a diagnosis of schizophrenia requires the continued presence of at least one symptom for more than six months; otherwise, the proper diagnosis would be no more than "schizophreniform disorder" or a "brief psychotic episode." Defendant's mother had said that, within an hour before the crash, he appeared happy.

¶ 47    Rone testified that she had heard from Rubel that defendant had had symptoms of schizophrenia for six months or more. Rubel's statements were confirmed by defendant.

Rone had ruled out the possibility that defendant's behavior that caused the crash had resulted from K2, DMT, or cannabis: toxic psychosis from a drug is reversible, but defendant's psychosis worsened during his time in jail and was evident in his agitated state during the police interview. Also, his psychosis was in remission when he was on Haldol. Finally, the toxicology report showed no evidence of K2 or DMT in defendant's system.

¶ 48    Defendant rested. The trial court granted his request for an instruction that would allow the jury to convict him of reckless homicide.

¶ 49    In closing argument, as pertinent here, the State contended that the evidence showed that defendant had engaged not in reckless conduct but in purposeful behavior that amounted to first degree murder. Defendant deliberately drove his vehicle into Villasenor's and knew that his conduct created a strong probability of death or great bodily harm: he told the OnStar operator that he had driven head-on into the Nissan, and he said the same thing in his terse written statement for the police. In the police interview, defendant said that he had collided with the Nissan on purpose, testing his mortality. Rone had diagnosed defendant with schizophrenia but had admitted that there was no objective test for the disease and that schizophrenia had not been present in defendant's family.

¶ 50    In response, defendant argued that the evidence did not prove first degree murder. He had had no motive to kill a total stranger, and the OnStar tape showed that he had not been rational: he told the operator that he had just collided with a car and that nobody was injured and "life is great." After the crash, defendant was calm and did not hide. His resistance to the arresting officers exemplified the tremendous strength that a psychotic state can produce. Defendant's conduct in his jail cell also proved his psychotic condition. He told Molidor and Wang that he brought about the crash because he was trying to test whether he was invincible. Defendant argued that his statements negated a finding beyond a reasonable doubt that he had had the *mens rea* for murder. He had had no idea what he was doing.

¶ 51    In reply, the State argued that, even had defendant believed that crashing his car into the Nissan was some sort of divine calling, the evidence still proved that he knew that the probable result was death or great bodily harm to another person. Even a mentally ill person would know that he could kill a person by driving twice the posted speed limit into a moving car. Proof of defendant's motive or possible drug use was not needed to establish criminal intent.

¶ 52    The jury convicted defendant of first degree murder and one count of aggravated DUI, and he was sentenced as noted. He timely appealed.

¶ 53                                    II. ANALYSIS

¶ 54    Defendant contends that his conviction of first degree murder must be reduced to reckless homicide because the State did not prove beyond a reasonable doubt that he committed the former offense. He concedes that the evidence was sufficient to prove reckless homicide.

¶ 55    In considering a challenge to the sufficiency of the evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the State, any rational fact finder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992). The trier of fact is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to

be drawn from the evidence. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). It is not our function to retry the defendant. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 56    Defendant notes that, to obtain a conviction of first degree murder, the State had to prove that he knew that his act created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2) (West 2012). By contrast, to obtain a conviction of reckless homicide, the State had to prove only that defendant's act was likely to cause death or great bodily harm and that he performed it recklessly. 720 ILCS 5/9-3(a) (West 2012). A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist, or that a result will follow, and that disregard grossly deviates from the standard of care that a reasonable person would exercise in the situation. 720 ILCS 5/4-6 (West 2012).

¶ 57    Defendant contends that the evidence, even when viewed most favorably to the State, did not prove beyond a reasonable doubt that, when he drove the Cadillac into the Nissan, he knew that there was a strong probability that the result would be death or great bodily harm to another. Defendant relies primarily on the evidence that his mind was severely disordered on the evening of November 21, 2012 (and for some months before). This includes evidence of his conduct immediately after the crash, especially his statements to the police at the scene; his explanation to Molidor and Wang that he brought about the crash because he felt a "calling" to prove his invincibility; and Rone's expert opinion that defendant was schizophrenic, based on the interviews, the testing, and the information from defendant's family and girlfriend.

¶ 58    Defendant's precise argument is somewhat unclear to us. This is in part because, conceding that the evidence was sufficient to prove reckless homicide, he provides apparently conflicting theories of how to distinguish that offense from first degree murder.

¶ 59    Defendant first cites authority that the distinction "rests in the degree to which the acts [the] defendant performed risk[ed] death or great bodily harm." *People v. Mifflin*, 120 Ill. App. 3d 1072, 1077 (1984). Thus, according to this authority, acts that create a " 'strong probability' of death or great bodily harm" will support a conviction of first degree murder, but acts that are merely "likely" to cause death or great bodily harm will support only a conviction of reckless homicide or its sister offense, involuntary manslaughter. *Id.* This authority bases the distinction on the *actus reus*—what the defendant did.

¶ 60    Defendant, however, also describes the issue in this case as turning on the sufficiency of the proof of his state of mind when he committed his act. He cites general authority for the proposition that state of mind must ordinarily be proved circumstantially. *People v. Bryant*, 79 Ill. App. 3d 501, 505 (1979). More specifically, defendant also argues that, because of his schizophrenia, he "could not have *known* that there was a strong probability that his conduct would cause another's death or great bodily harm." (Emphasis in original.) This argument assumes that the distinction between the two offenses, at least in this case, turns on the defendant's mental state and, specifically, on the presence or absence of guilty knowledge. However, after citing various cases in which the distinction between the two offenses was at issue, defendant states, "The distinction between murder and reckless homicide seem[s] to lie in whether the defendant acted with malice toward another or whether he acted in disregard of the risk of harming another." This statement also bases the distinction on the defendant's mental state, but it turns not on knowledge but on intent. Thus, defendant appears to have set forth three mutually exclusive theories for why his conviction ought to be reduced, although it appears that he argues primarily for the second one.

- 11 -

¶ 61    Ultimately, defendant's equivocation need not concern us. Both his mental state and the character of his act are pertinent; the difference between the offenses is what he knew. "Knowing" murder requires proof of (1) knowledge of (2) a strong probability. 720 ILCS 5/9-1(a)(2) (West 2012). Reckless homicide requires proof of (1) "conscious[ ] disregard[ ]" of (2) a substantial (and unjustifiable) risk. 720 ILCS 5/4-6 (West 2012). The respective criteria numbered (1), which address a defendant's mental state directly, do not explain the difference between the offenses. We see no meaningful distinction between "knowledge" and "conscious disregard," at least not one that aids a defendant. To consciously disregard something, one must *know* it.

¶ 62    Therefore, the distinction between the two offenses must lie in the difference between the respective criteria numbered (2). We agree with *Mifflin* that a "strong probability" is more than a "substantial risk." This does not mean that defendant's mental state is irrelevant. Even if he knew that there was a "substantial risk" that his act would cause death or great bodily harm, he might not have known that it created a "strong probability" of this result. The issue is not whether the evidence proved that the act, considered objectively, created a strong probability of death or great bodily harm but whether the evidence proved that the act, considered objectively, created a strong probability of death or great bodily harm *and* that defendant was aware of that strong probability—and not merely of the substantial risk of death or great bodily harm.

¶ 63    This, indeed, appears to be the nub of defendant's argument on appeal and the reason that he emphasizes his impaired mental state as negating his guilt of murder. A person whose perception of reality is compromised might know that he faces a risk of causing a given result but not that he faces a strong probability of causing it. Defendant contends that the evidence required the jury in his case to so conclude. For the reasons that follow, we disagree.

¶ 64    We see no serious argument that defendant's act itself did not create a strong probability of causing death or great bodily harm. Viewed most favorably to the State, the evidence showed that defendant crossed the median while driving his car at no less than 65 miles per hour, approximately twice the posted speed limit, and rammed it directly into the front of a moving vehicle. That this act created a strong probability of death or great bodily harm cannot be disputed. The State's case was no weaker than several in which the courts of review affirmed guilty verdicts of first degree murder based on knowledge. See, *e.g.*, *People v. Alsup*, 373 Ill. App. 3d 745, 748, 754 (2007) (evidence proved defendant guilty of knowing murder, as opposed to mere reckless homicide; defendant, who led police on high-speed chase, drove through red light at 29 miles per hour over speed limit and broadsided another vehicle, causing victim's death); *People v. Thomas*, 266 Ill. App. 3d 914, 917, 926 (1994) (defendant led police on high-speed chase down congested street, ran red light at intersection without slowing down, and collided with car traveling in cross-traffic; evidence supported murder conviction despite defendant's argument that his view was obstructed shortly before collision).

¶ 65    Defendant contends, however, that the evidence left a reasonable doubt of whether he *knew* that his act created a strong probability of death or great bodily harm. He notes the strong evidence that he was suffering from a mental disorder, schizophrenia, and that as a result he was experiencing various thought disorders, such as hallucinations and delusions. Defendant points to his highly unusual behavior immediately after the crash. His response to the OnStar operator was oddly calm yet included bizarre statements that reflected his

- 12 -

delusion that he was immortal and his detachment from what had actually happened. Defendant walked away from the scene; refused to stop when Bell ordered him; told officers that he was "Robert Paulsen" and that Paulsen had died in the crash; said that he was walking to Italy; and resisted the six or seven officers' attempt to arrest him, displaying the sort of extraordinary strength that, according to Rone, a person can have during a psychotic episode. Also, defendant notes, tests did not reveal any evidence that he had been under the influence of alcohol or drugs, other than an indeterminate amount of cannabis, the effects of which are ordinarily inconsistent with his behavior on the evening of November 21, 2012.

¶ 66    Defendant also notes the considerable indirect evidence that, on that evening, he was suffering from a psychotic disorder that severely impaired his cognition and his ability to process events as a nonpsychotic person would. Defendant points to his bizarre behavior in his cell and to his incoherent or irrational remarks to Molidor, such as his statement that he had been testing his immortality and his curious references to his abortions and a nonexistent Kia. Defendant also notes Rubel's account to Rone of his paranoid and delusional statements and behaviors in the months preceding the crash. Finally, of course, defendant cites Rone's expert opinion that he was suffering from schizophrenia, a psychotic disorder that causes its victims hallucinations or delusions and thus difficulties with cognitive and executive functioning.

¶ 67    For purposes of this appeal, we shall assume that the State did not disprove beyond a reasonable doubt that, in the period preceding the crash, defendant was suffering from schizophrenia or, at the least, a brief psychotic episode. Nonetheless, we cannot say that the jury could not find beyond a reasonable doubt that defendant had the *mens rea* on which a conviction of first degree murder as charged could be based.

¶ 68    The State's burden was to show guilty knowledge, not to prove that defendant was legally sane at the time of the crash. The State did not need to prove that defendant *intended* to kill or cause great bodily harm to another person. It needed to prove only that he *knew* of the strong probability that he would cause at least one of those results. As noted, had defendant suffered no psychosis, the evidence would not have been close. Ordinarily, it is a perfectly reasonable inference that a driver who proceeds at twice the posted speed limit, crosses the median into oncoming traffic, and swerves sharply into the front of a vehicle going the other way, hitting it head-on, knows that he is creating a strong probability of killing or severely harming another person. Indeed, it would be difficult to imagine a reasonable jury not finding guilty knowledge under this scenario.

¶ 69    The evidence of defendant's psychosis, its severity, and its close relationship to his conduct did not create a reasonable doubt of his guilty knowledge. As Rone noted, a schizophrenic does not lose all contact with reality or all ability to absorb and retain information. And defendant's apparent delusions did not necessarily cast doubt on whether he knew that his conduct could easily kill or severely injure another person. His belief that he was acting on a "calling" to test his immortality was not inconsistent with a recognition that he would probably get another person killed or severely injured. Defendant's delusion that he was acting under orders from demons did not negate his recognition that he was causing an automobile collision that would probably be fatal or greatly harmful to another.

¶ 70    It is important to note affirmative evidence, beyond the nature of defendant's conduct itself, that he was aware of reality to a great degree and did perceive the consequences of his act. His delusional motive itself provides some such evidence. The jury reasonably inferred

that, in believing that he had to test whether he was immortal by crashing his car into another vehicle, defendant recognized that such crashes ordinarily carry a strong probability that someone will be killed (and, *a fortiori*, severely injured). Otherwise, he would not have considered his act a test of his invincibility. And if he knew that his conduct could kill him, at least were he not protected by his "calling," it was fair to infer that he knew that it could kill someone else.

¶ 71 Other aspects of defendant's conduct also helped the jury to conclude that his contact with reality had not been so attenuated that he could not have recognized what otherwise was an obvious probability. Defendant drove to his parents' home, picked up his mother's car, and managed to drive it on Cedar Lake Road until he deliberately steered it into the Nissan. He told the OnStar operator that he had just driven into another vehicle; he was not so deluded that he did not realize what had just happened. It was a fair inference that, having recognized the reality of the crash just after it occurred, he had also recognized the probability of the crash and its consequences just before it occurred. Defendant also recognized these consequences later, when he talked to Molidor and Wang.

¶ 72 In sum, defendant has not persuaded us that he was not proved guilty beyond a reasonable doubt. The State relied in part on indirect evidence of guilty knowledge, but as defendant concedes, state of mind must ordinarily be proved circumstantially. *Bryant*, 79 Ill. App. 3d at 505. Here, as we have explained, the circumstantial evidence was extremely strong, based on the character of defendant's act and its surrounding circumstances. Moreover, the expert psychiatric testimony did not negate the inference that defendant knew the natural and probable consequences of his act, despite the distorted thinking that accompanied it.

¶ 73 Defendant suggests that the prosecutor misstated the law in his closing argument and that this might have contributed to the jury's verdict. Defendant does not, however, raise this comment as an independent ground for reversal and does not develop it in any way. Therefore, we consider any such claim forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013).

¶ 74                                    III. CONCLUSION

¶ 75 For the foregoing reasons, we affirm the judgment of the circuit court of Lake County. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2014); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 76      Affirmed.